STATE, RESPONDENT, v. SMITH, APPELLANT.

(No. 4,487.)

(Submitted April 16, 1920. Decided May 3, 1920.)

[190 Pac. 107.]

*Criminal Law—Sedition—Jury—Statutes—Intent — Defenses —Offer of Proof—Instructions—Evidence—Stenographers— Cross-examination—Constitution—Free Speech—Free Press —War—Newspapers—Publication.*

Jury—Purpose of *Voir Dire* Examination.

1.  The purpose of the *voir dire* examination of veniremen is to enable counsel not only to determine whether there exists a state of mind on the part of any juror which will prevent him from acting impartially and without prejudice to the substantial rights of either party, but also to exercise intelligently the peremptory challenges allowed by law.

Sedition—Jury—*Voir Dire* Examination—Benefit of Doubt—Erroneous Exclusion of Proper Question.

2.  In a prosecution for sedition, the defendant being charged with the publication of an article in a newspaper which was calculated to incite or inflame resistance to the state council of defense in connection with the prosecution of the war, refusal to permit a juror on his *voir dire* examination to answer the question whether, if there was a reasonable doubt in his mind as to whether or not the article was calculated to incite or inflame resistance, *etc.*, he would acquit defendant, was error, in the absence of an instruction that he could be convicted only if the jury found beyond a reasonable doubt that the statement was calculated to incite or inflame resistance to constituted authority.

Criminal Law—Assumption of Fact as Proven—Error.

3.  In a criminal cause, the district court cannot take from the jury or assume as proven, any essential fact, no matter how conclusive the evidence may appear to be.

Same—*Mala Prohibita*—Intent Immaterial.

4.  In a statutory crime, enacted under the police power of the state, it is not necessary to make evil intent an ingredient of the prohibited act.

Statutes—Legislative Intent Controlling.

5.  The legislative intention in the enactment of a statute, if ascertainable, is controlling.

Sedition—Publication of Seditious Article—Intent.

6.  *Held*, that the intent of the person deliberately writing or publishing a seditious article contrary to the provisions of Chapter 11, Extra. Session, Laws of 1918, is immaterial and not an ingredient of the crime of sedition; hence error was not committed by the trial court in sustaining objections to questions asked prospective jurors or witnesses concerning such intent.

For authorities passing on the question of intent as an element of crime, see note in 11 L. R. A. 807.

Same—Intent—Instructions.

7.   Since intent is not an ingredient of the crime of sedition consisting of the publication of an objectionable article in a newspaper, refusal of instructions embodying the provisions of sections 8112 and 8113, Revised Codes, relative to union of act and intent and how intent may be manifested, was proper.

Same.

8.   *Held,* that it was error to instruct the jury in a prosecution for publishing a seditious article, that, the state having proven that the law had been violated, guilty intent is conclusively presumed, since it included the intent to publish the article which was immaterial, and did not limit it to the intent presumed from a publication likely to incite and inflame resistance to duly constituted federal or state authority.

Criminal Law—Intent.

9.   The deliberate commission of an act includes the intent to commit the act.

Same—Intent—Disputable Presumptions.

10.   The presumption that an unlawful act was committed with an unlawful intent is disputable.

Sedition—Defense—Intent—Improper Refusal of Offer of Proof.

11.   *Held,* that conviction for publishing a seditious article could be had only if the act was deliberately or intentionally committed, and that it was therefore error to exclude an offer of proof that defendant, as vice-president of a publishing company, did not intend to publish the article, *i. e.,* that it was published without his knowledge or against his express command, or through the negligence of an employee,—the testimony to be weighed against the disputable presumption of intent arising from the commission of the act.

Same—Officer of Corporation—Defense—Instruction—Proper Refusal.

12.   An instruction that failure of defendant, vice-president of a publishing company, to prevent the publication of a seditious article, was not sufficient to render him criminally responsible, was properly refused, mere failure to act not being sufficient to exonerate him.

Instructions—Abstract Propositions.

13.   The giving of an abstract proposition of law, not based upon the issues or facts supported by the evidence, is error.

Sedition—Conviction for Crime Other Than Charged—Erroneous Instruction.

14.   Defendant having been charged with publishing a certain seditious article directed against the state council of defense, it was error to charge the jury that they could adjudge him guilty if they found that he uttered, wrote or printed *any* language at any time between two dates covering a period of seven months calculated to incite or inflame resistance to *any* duly constituted state authority, *etc.,* in the absence of an instruction limiting it to the particular act charged against defendant, and no evidence appearing in the record to show that he wrote or printed the article in question.

Instructions—To be Viewed as Whole.

15.   Instructions must be examined in their entirety, and where as a whole they correctly state the law, and where those instructions general in their nature are by specific instructions limited to the facts in the case, error cannot be predicated on an incomplete or a too general instruction.

Criminal Law—Instructions—How to be Framed.
16.    An instruction in a criminal prosecution should be so explicit and so closely connected with the facts of the case as to enable the jury to apply the law to the facts.

Same—Evidence—Stenographer Reading from Transcript—When Proper.
17.    Where a stenographer is called as a witness, the better practice is to have him read from his notes, although he may be permitted to read from the transcript thereof if a sufficient foundation has been laid establishing his ability and accuracy, a liberal cross-examination being permitted in this respect.

Sedition—Evidence—Admissions—When not Admissible.
18.    Testimony in which defendant admitted responsibility for publishing an article of a date different from the one charged in the information as seditious should have been stricken, in view of an erroneous instruction to the jury that the crime charged was complete if defendant had published *any* seditious language between two given dates.

Same—Witnesses—Former Conviction of Felony—Cross-examination.
19.    A witness may properly be required under section 8907, Revised Codes, to answer the question, on cross-examination, if he had not been convicted of a felony.

Sedition—Free Speech—Free Press—Constitutional Guaranties.
20.    The constitutional guaranty of free speech and free press was not suspended by the war, abuse of the guaranty only being punishable.

Same—Limits of Free Speech and Free Press—Power of Legislature.
21.    Though the constitutional guaranty of free speech and free press was not suspended by the war, the legislature could properly by Chapter 11, Extra. Session Laws of 1918, define the limits of both by declaring that the use of language calculated to incite or inflame resistance to a duly constituted federal or state authority in connection with the prosecution of the war constituted an abuse of that liberty and a crime against the state.

Same—Place of Crime—Proof—Jurisdiction.
22.    Under section 16, Article III, of the Constitution, proof of the charge in the information that defendant published the seditious article mentioned therein, in a certain county, was indispensable to give the district court of such county jurisdiction to try the cause.

Same—Language Calculated to Inflame, *etc.*—Definition.
23.    *Held,* that the word "calculated" as used in the Sedition Act above, prohibiting, *inter alia,* the publishing of words "calculated to incite or inflame resistance," *etc.,* was intended to be understood to mean "likely to produce" the above effect, whether intended that it should or not.

Same—Newspaper Publication—Circulation—Evidence.
24.    Evidence of the extent of the circulation of a daily newspaper was not evidence of its circulation at a date a month previous when it was a weekly.

Same—Seditious Language—Effect—Jury Question.
25.    Whether alleged seditious language was or was not calculated to have the effect mentioned above (paragraph 23) was a question of fact for the jury from all the surrounding facts and circumstances, including the manner and extent of publication, as well as the inherent quality of the language used.

Same—Publication of Seditious Article—Evidence—Insufficiency.

26. *Held*, that where the only evidence of a publication of alleged seditious language calculated to incite or inflame resistance to the Montana Council of Defense consisted of the testimony of a member of the council to the effect that he as a subscriber received a copy of the paper containing the article through the mail and that he read it, it was insufficient, in the absence of further testimony that the article was made known to any person other than such member of said council, to show a publication the effect of which was likely to incite or inflame resistance to the council, or to prove the offense charged in the information.

*Appeal from District Court, Lewis and Clark County; R. Lee Word, Judge.*

R. B. SMITH was convicted of sedition, and appeals from the judgment and an order denying him a new trial. Reversed and remanded.

*Messrs. Wheeler & Baldwin* and *Messrs. Nolan & Donovan,* for Appellant, submitted a brief; *Mr. L. P. Donovan* argued the cause orally.

The information charges that the defendant did "at the county of Lewis and Clark, state of Montana * * * write and print and publish and circulate" the editorial set forth in the information. The testimony in the case showed conclusively that the article was not written and was not printed in Lewis and Clark county. We have, therefore, to consider only the question, Was it published in that county, within the meaning of the Sedition Act? We contend that it was not. The evidence does not show that the article was published in the ordinary meaning of the word. It fails entirely to show that the statements contained therein were communicated to the public by the defendant or by anyone for whose acts he is criminally responsible. The exposure of the editorial in question here to a member of the State Council of Defense was not a publication that could possibly "incite or inflame resistance" to the council of which he was a member, and, therefore, it falls entirely outside of the Act. (Chap. 11, Laws Extra. Session 1918.) And since this is the only publication proven in

the case at bar, the court should have directed a verdict of "not guilty."

The information does not allege an offense in that (a) it fails to charge that the article was written, printed or published by the defendant with intent to incite or inflame resistance. This is a necessary ingredient of the offense. (*State* v. *Kahn,* 56 Mont. 108, 182 Pac. 107.) "It must be remembered that, as hereinbefore stated, the word 'calculated,' as used in the Sedition Act, has much the same meaning as the word 'intent.'" (*State* v. *Wyman,* 56 Mont. 600, 186 Pac. 1.)

(b) The information is insufficient in that it fails to charge that the statements made in the editorial complained of were untrue or that the same was not published with good motives and with justifiable ends. The Constitution guarantees freedom of speech (section 10, Article III, Constitution of Montana), and the purpose of the constitutional provision was to make impossible prosecutions for seditious libel as the same were conducted by the government of Great Britain at or about the time of the American Revolution. (Newell on Slander and Libel, 3d ed., sec. 25; 2 May on Constitutional History of England, 2d ed., 9, note; *Abrams* v. *United States,* 250 U. S. 616, 63 L. Ed. 1173, 40 Sup. Ct. Rep. 10.) And the narrowest construction that can be given these constitutional provisions allows the individual "the right to publish, with impunity, truth with good motives and for justifiable ends, whether it respects government, magistracy or individuals." (*People* v. *Croswell,* 3 Johns. Cas. 337, 397.)

Appellant's examination of the jurors was improperly and illegally restricted. He had a right to challenge any juror "for the existence of a state of mind on the part of the juror in reference to the case or to either of the parties which will prevent him from acting with entire impartiality and without prejudice to the substantial rights of the other party" (sec. 9261, Rev. Codes). We contend that one of the substantial rights to which appellant herein was entitled was that the state should be required to prove every element of the alleged

offense beyond a reasonable doubt, and that, if the juror's state of mind was such that he would not require proof of some of these elements, that was a state of mind that would prevent him from acting with entire impartiality and without prejudice to the substantial rights of appellant. (*Davis* v. *Walker*, 60 Ill. 452; *State* v. *Brown*, 15 Kan. 400.) Intent was one of the elements of the offense; knowledge of the character of the article was another element; and the question, whether or not the article itself was of a character to incite or inflame resistance to the State Council of Defense was one of the substantial issues in the case.

The appellant attempted to prove that he had consulted an attorney at law regarding the validity of the order made by the Council of Defense and which gave rise to the article complained of, and was by him advised that the order was illegal and void, and that the appellant could lawfully disregard the same. But the testimony was excluded. The advice of an attorney is admissible in any case where a criminal intent is a necessary ingredient of the offense. The following cases illustrate the rule: The advice of an attorney that the defendant was entitled to take and carry away the property is admissible in a prosecution for larceny (8 Ency. of Evidence, 131; *People* v. *Schultz*, 71 Mich. 315, 38 N. W. 868). It is admissible in cases of malicious mischief (8 Ency. of Evidence, p. 3871); in malicious prosecution (*Id.*, p. 403); and in libel and slander (*Id.*, p. 380). In a case such as this, where a specific unlawful intent is a necessary ingredient of the offense, the advice received by defendant and his belief therein bore directly upon a principal issue in the case. The evidence should have been admitted.

Over the objection of the defendant, the court gave to the jury as one of its instructions the whole Sedition Act. The instruction involved many elements in no manner connected with the case on trial, and the jury were in effect told that they were not limited to trying the defendant upon the charge contained in the information, but might find him guilty if they

concluded that he violated any provision of the Act. The instruction should have been confined to the issues in the case. (*Bullard* v. *Smith*, 28 Mont. 387, 410, 72 Pac. 761; *First Nat. Bank* v. *Carroll*, 35 Mont. 302, 317, 88 Pac. 1012; *State* v. *Trosper*, 41 Mont. 442, 446, 109 Pac. 858.) This instruction, not being warranted by the pleadings or the evidence, should not have been given to the jury.

*Mr. S. C. Ford,* Attorney General, and *Mr. Otto A. Gerth,* Assistant Attorney General, for Respondent, submitted a brief; *Mr. Gerth* argued the cause orally.

It is the rule of law that a party to an action, be it the state or the defendant in a criminal prosecution, has no right to put to the proposed juror a hypothetical set of facts such as was attempted by appellant, and ascertain from him in advance as to how he is going to vote in a verdict. The case of *State* v. *Huffman,* 86 Ohio, 229, Ann. Cas. 1913D, 677, 99 N. E. 295, is one which clearly announces the rule as above stated. It is held in this case generally that questions hypothetical in nature tend to coach the jury or the jurors to obstinacy, erroneous views of the evidence, and also erroneous views of the law. These questions tend to commit the jury to certain views and make them promise in advance what they intend to do at the conclusion of the trial. The case cites authorities and announces the proposition that a juror not only has the right but should take into consideration the views of his fellow-jurors in arriving at a verdict. Hypothetical questions as a rule, therefore, lead the juror to believe that he has no right to consider the views of his fellow-jurors. (*Allen* v. *United States,* 164 U. S. 492, 41 L. Ed. 528, 17 Sup. Ct. Rep. 154 [see, also, Rose's U. S. Notes]; *State* v. *Bokien,* 14 Wash. 403, 44 Pac. 889; *Commonwealth* v. *Van Horn,* 188 Pa. St. 143, 41 Atl. 469; *People* v. *Warner,* 147 Cal. 546, 82 Pac. 196.)

Testimony as to whether the article for which appellant was prosecuted did or did not incite or inflame resistance to the Montana Council of Defense is not permissible in cases of this

kind. It is for the jury to determine exclusively whether the article incited or inflamed resistance to the Montana Council of Defense or whether it has that effect. Evidence directly upon that proposition is incompetent as invading the province of the jury. As to what particular effect the article had upon the particular witness would be no criterion upon the proposition of whether or not it was reasonably calculated to incite resistance to the Montana Council of Defense. Therefore, the evidence which was rejected was properly rejected as incompetent and not tending to prove or disapprove any issue in the case.

The same contention has been raised in all of the sedition cases, both state and federal, but in a slightly different form. For instance, it is contended that an article in order to come under the condemnation of the Sedition Act must be shown to have been given to or circulated among persons within the draft age. The contention is usually made that an article shown to or circulated among men beyond the draft age or among women and children can do no harm. The courts, however, universally have overruled such a contention and that establishes a direct precedent for our contention in this instance. (*State* v. *Kahn,* 56 Mont. 108, 182 Pac. 107; *Kirchner* v. *United States,* 255 Fed. 301, 303.) The appellant has raised the same proposition which has been raised in every sedition case and which without exception has been ruled upon adversely thereto by every court in the land. It is this: The state has failed to prove an offense under the Sedition Act for the reason that the article upon which the prosecution was based was not shown to persons who could be influenced against the government's war program. In *Kirchner* v. *United States, supra,* practically the same kind of question was raised under the Federal Espionage Act. The court held in effect that the government need not show the effect of an article. An article may have its pernicious effect upon many branches of government war activities. There are many properly recognized war

instrumentalities in connection with the war, even though outside of actual military operations.

## Opinion—PER CURIAM.

The defendant was convicted of the crime of sedition and appealed from the judgment.

The information charges that the defendant willfully and feloniously did write, print and publish of and concerning the Montana Council of Defense a statement (which is set forth in the information, but which is too long to be here reproduced), which contained, among other things, the following: ''Fortunately they have no legal status or authority. They can fulminate to their heart's content against anything and everything that menaces their master's interest, but no one need pay any attention to them.'' It is charged that this statement so published was calculated to incite and inflame resistance to the Montana Council of Defense, a duly constituted state authority in connection with the prosecution of the war. Counsel for defendant made 107 assignments of error, but such of these as require special consideration may be grouped under a comparatively few heads. A number of the contentions have been determined adversely to defendant in other sedition cases recently decided.

Upon the *voir dire* examination, counsel for defendant [1, 2] propounded to the juror Ellis this question: ''Q. And if, after hearing all of the evidence in this case, there was a reasonable doubt in your mind as to whether or not this article in question was calculated to inflame or incite resistance to the State Council of Defense, would you give the defendant the benefit of the doubt and vote for his acquittal?'' An objection by the county attorney was sustained, and the juror was not permitted to answer. The same question was asked the juror Porter, with the same result. In each instance the court erred.

The defendant was prosecuted under the provision of the Sedition Act (Laws Ex. Sess. 1918, Chap. 11), which provides: ''Whenever the United States shall be engaged in war, any

person or persons who  *  *  *  shall utter, print, write or publish any language calculated to incite or inflame resistance to any duly constituted federal or state authority in connection with the prosecution of the war,  *  *  *  shall be guilty of the crime of sedition.''

The purpose of the *voir dire* examination of veniremen is to enable counsel to determine whether there exists a state of mind on the part of any juror which will prevent him from acting with entire impartiality and without prejudice to the substantial rights of either party, which the statute (sec. 9261, Rev. Codes) denominates actual bias, and to enable counsel to exercise intelligently the peremptory challenges allowed by law. (*State* v. *Brooks, ante,* p. 480, 188 Pac. 942.) The gist of the offense with which the defendant was charged was that the published statement was calculated to incite or inflame resistance to the Montana Council of Defense in connection with the prosecution of the war. It may be that the error would have been cured if the court had instructed the jury, as it should have done, that in order to justify a conviction they must find from the evidence beyond a reasonable doubt that the statement was calculated to incite or inflame resistance to the Montana Council of Defense in connection with the prosecution of the war; but the court failed to give any instruction upon the subject, and from this omission, and from the ruling upon the question now under consideration, the jurors must have understood that the allegation of the information that the statement was calculated to incite or inflame resistance was an immaterial one, or one upon which it was not necessary for the jury to find. In other words, the effect of the court's ruling, and its failure to instruct upon this subject, was to take from the jury the determination of the principal question involved in the trial [3] and to determine it as one of law. It matters not how conclusive the evidence upon any essential element of the charge may appear to be, the constitutional guaranty of trial by jury absolutely precludes the court from assuming that the fact is proved.

Many errors are assigned on the rulings of the trial court in [4–6] the examination of jurors and of witnesses, and in the settlement of instructions, in consistently excluding the theory of the defense that the intent or intention of defendant and his colleague, Dunn, in either writing, printing, uttering or publishing the article in question, is a necessary ingredient of the crime charged. These specifications raise but two questions: (1) As to the admissibility of evidence of the intent to "incite or inflame resistance," *etc.;* and (2) as to the intent of the defendant to publish the article, and call for a determination as to what intent, if any, must be established by the state in order to warrant a conviction in sedition cases.

The validity of the Sedition Act was upheld by this court in the case of *State* v. *Kahn,* 56 Mont. 108, 182 Pac. 107, and in that case, and in the later case of *State* v. *Wyman,* 56 Mont. 600, 186 Pac. 1, this court gave the question of intent some consideration, although in neither case was it necessary to go into the matter fully. In the *Kahn Case* we said: "Sedition is a purely statutory offense, and our Act is declared to be, and is in fact, a general police regulation. It is elementary that for the preservation of the peace, the safety of the people, and the good order of society the legislature may prohibit certain acts, and attach a penalty for disobedience, without including any evil intent as an ingredient of the offense other than the general intent implied from a violation of the statute [citing 12 Cyc. 148; 8 R. C. L. 62]. But the provision of the statute is 'shall utter language calculated to incite or inflame resistance,' *etc.* Primarily the word 'calculate' means to compute mathematically, and it implies power to think, to reason, to plan. In its broader significance it means to intend, to purpose, to design. (Century Dictionary; Standard Dictionary.)"

In the *Wyman Case* we said: "The same [that the question was disposed of by the *Kahn Case*] is true of appellant's contention that the sedition law is defective, in that it * * * omits the 'basic element of "intent" altogether'; the *Kahn Case* laying down the rule that the Sedition Act, being purely

statutory, is valid, though intent is not made an ingredient, and that, if the intent were needed, the word 'calculated' is sufficiently broad to include intent [quoting the above excerpt from the *Kahn Case*]."

In the consideration of these cases we might well have omitted the reference to any analogy between "calculated" and "intended," as having no place in the opinion, and based our conclusion squarely on the principle quoted from Cyc. in the *Kahn Case*.

While it is true that our statute declares that "in every crime there must be a union or joint operation of act and intent," the statute is but declaratory of the common-law rule (Bishop's New Crim. Law, Chap. 18; 16 Corpus Juris, 75), and an exception to this rule, in so-called "statutory crimes" enacted under the police power of the state, is recognized by the great weight of authority. As stated in the *Kahn Case*: "Our Act is declared to be, and is in fact, a general police regulation."

The writer on the subject of "Intent," in 16 Corpus Juris, page 76, disposes of this question as follows: "The legislature * * * may forbid the doing of an act, and make its commission criminal, without regard to the intent or knowledge of the doer; and, if such legislative intention appears, the court must give it effect, although the intent of the doer may have been innocent [citing cases from a large per cent of the states]. This rule has been generally, although not quite universally, applied in the enforcement of statutes passed in aid of the police power of the state." A like rule is announced in 12 Cyc. 148; 8 R. C. L. 62.

The legislative intention in the enactment of a statute, if ascertainable, is controlling. "It is both a common-law and a statutory rule of construction of statutes that the intention of the legislature must be discovered, and, if possible, pursued." (*Power* v. *County Commrs.*, 7 Mont. 82, 14 Pac. 658; *Lerch* v. *Missoula Brick & Tile Co.*, 45 Mont. 314, Ann. Cas. 1914A, 346, 123 Pac. 25.) Happily, in this instance, the wording of the

statute itself clearly indicates the intention of the legislature as to the crime charged against this appellant.

An analysis of section 1 of the Act discloses that, while a large number of prohibited acts are embraced within a single section, they naturally fall into eight distinct subdivisions, to-wit:

"Whenever the United States shall be engaged in war, any person  *  *  *

" (1) Who shall utter, print, write or publish any disloyal, profane, violent, scurrilous, contemptuous, slurring or abusive language about the  *  *  *  government of the United States,  *  *  *  or the soldiers or sailors of the United States;  *  *  *

" (2) Or any language *calculated* to bring the form of government of the United States,  *  *  *  or the soldiers or sailors of the United States, or the flag of the United States, or the uniform of the army or navy of the United States, into contempt, scorn, contumely or disrepute;

" (3) Or shall utter, print, write or publish any language *calculated* to incite or inflame resistance to any duly constituted federal or state authority in connection with the prosecution of the war;

" (4) Or who shall display the flag of any foreign enemy;

" (5) Or who shall by utterance, writing, printing, publication or language spoken, urge, incite or advocate any curtailment of production in this country of any thing or things, product or products necessary or essential to the prosecution of the war in which the United States may be engaged *with intent* by such curtailment to cripple or hinder the United States in the prosecution of the war;

" (6) Or,  *  *  *  shall willfully make or convey false reports or statements *with intent* to interfere with the  *  *  *  success of the military or naval forces of the United States, or promote the success of its enemy or enemies;

" (7) Or  *  *  *  shall willfully cause  *  *  *  disaffection in the military or naval forces of the United States;

"(8) Or who shall by uttering, printing, * * * publication, language spoken, or by any act or acts, interfere with, obstruct, or attempt to obstruct, the operation of the national selective draft law or the recruiting or enlistment service of the United States *to the injury* of the military or naval service thereof, shall be guilty of the crime of sedition."

Thus dividing the Act into its component parts, it will be readily seen that, as to those subjects falling in subdivisions 1 and 4, the prohibition is against the doing of the act itself, no matter what the intent or what the result thereof may be, while, as to those falling in subdivisions 2 and 3, the legislature also omitted the element of intent, but made the guilt or innocence of the accused depend upon whether the language used was "calculated" to bring about the undesirable results enumerated.

Coming down to subdivisions 5 and 6, we find that the legislature was not unmindful of the element of intent in criminal offenses, and, as to the acts here enumerated, made the intent of the offender the gist of the crime; while, as to those acts included in subdivision 7, they again excluded the question of intent, but made the law applicable to those persons only who commit the forbidden acts "willfully"; and under subdivision 8 they again prohibit the commission of certain acts without regard to intent, but provide for punishment only in case those acts result in actual injury to the military or naval forces of the United States.

It is therefore apparent that, in drafting the Act, the legislature exhibited a nice discrimination in the treatment of the several subjects under consideration, as constituting the crime of sedition, and that, whenever that body deemed a specific intent a necessary ingredient of the crime defined, it had no hesitancy in including it in the definition of the crime; and when it felt, for the peace and safety of society, an act should be prohibited, regardless of the intent of the doer of that act, it had as little hesitancy in excluding that element from its definition. It is clear from this analysis that, as to the acts

here complained of, the legislature intended to prohibit the writing, printing, uttering or publication of any language likely to incite or inflame resistance to any duly constituted federal or state authority in the prosecution of the war, regardless of the intent or intention of the offender—to prevent, at all hazards, the results likely to flow from the commission of the act itself.

As it appears that the legislature included the element of intent in the definition of the crime of sedition in certain of the subdivisions indicated, and enumerated all the elements that body considered essential to the crime as defined in the subdivision under consideration, the element of intent was manifestly excluded, as an essential ingredient of the crime as here charged, both by the clear intention of the legislature and under the rule "*expressio unius est exclusio alterius.*" The rule heretofore announced, under which the legislature is conceded to have the authority so to provide, is in conformity with the former decisions of this court and with the great weight of authority throughout the United States.

In the case of *State* v. *Rechnitz,* 20 Mont., at page 491, 52 Pac., at page 265, this court said: "We do not lose sight of the fact that the rule above discussed is not inflexible, and that many acts may become crimes by violation of statutes relating to certain subject matters, and that a statute may be so worded as to make an act criminal without regard to the question of the intent of the person doing such act."

In the case of *Leggatt* v. *Prideaux,* 16 Mont. 205, 50 Am. St. Rep. 498, 40 Pac. 377, this court quoted with approval from *Gardner* v. *People,* 62 N. Y. 299, as follows: "The rule on the subject appears to be that in acts *mala in se* the intent governs, but in those *mala prohibita* the only inquiry is: Has the law been violated?"

In *State* v. *Gilbert,* 141 Minn. 263, 169 N. W. 790, the supreme court of Minnesota, in passing on a statute prohibiting teaching or advocating nonenlistment, *etc.,* said: "The statute makes teaching or advocating nonenlistment or nonaid unlaw-

ful. It does not make the intent of the teacher or advocate an ingredient of the offense. The statute is a police regulation, and under it the doing of the forbidden act is a criminal offense, regardless of the intent.''

''There is a well-recognized distinction between acts *mala in se* and *mala prohibita*. Under the latter it is well settled that criminal intent forms no part or element of the offense.'' (*People* v. *D'Antonio,* 150 App. Div. 109, 134 N. Y. Supp. 657; see, also, *People* v. *Werner,* 174 N. Y. 132, 66 N. E. 667.) ''It is the province of the legislature to determine in the interest of the public what shall be permitted or forbidden, and the statutes contain very many instances of acts prohibited, the criminality of which consists solely in the fact that they are prohibited, and not at all in their intrinsic quality.'' (*People* v. *West,* 106 N. Y. 293, 60 Am. Rep. 452, 12 N. E. 610; 16 Corpus Juris, 77, note a.)

The supreme court of Michigan, in upholding a statute forbidding certain acts without regard to the intent, said: ''As a rule there can be no crime without a criminal intent; but this is not by any means a universal rule. * * * Many statutes which are in the nature of police regulations, as this is, impose criminal penalties irrespective of any intent to violate them; the purpose being to require a degree of diligence for the protection of the public which shall render violation impossible.'' (*People* v. *Roby,* 52 Mich. 577, 50 Am. Rep. 270, 18 N. W. 365.) This case is cited with approval in *People* v. *Snowberger,* 113 Mich. 86, 67 Am. St. Rep. 449, 71 N. W. 497, where many cases upholding the doctrine are cited, and where it is said: ''Generally it is for the legislature to determine what laws and regulations are needed to protect the public health and secure the public comfort and safety. If it passes an Act ostensibly for the public health, and thereby destroys or takes away the property of the citizen or interferes with his liberty, it is for the courts to determine whether it relates to and is appropriate to promote such public health. Under the police power, the conduct of individuals and the use of property may

be regulated, so as to interfere to some extent with the freedom of the one and the enjoyment of the other. It cannot be doubted that the legislature intended by this Act to protect the public against the harmful consequences of sales of adulterated food, and, to the end that its purpose might not be defeated, to require the seller, at his peril, to know that the article which he offers for sale is not adulterated. As was said by the supreme court of Ohio in *State* v. *Kelly,* 54 Ohio St. 166: 'If this statute had imposed upon the state the burden of proving ∗ ∗ ∗ his knowledge of its adulteration, it would have thereby defeated its declared purpose.' " (*Kelley* v. *Daily Co.,* 56 Mont. 63, 181 Pac. 326.)

In the case of *State ex rel. Rowe* v. *District Court,* 44 Mont. 318, 119 Pac. 1103, this court said: "When an act is in general terms made indictable, a criminal intent need not be shown, unless from the language of the law applicable a purpose to require the existence of such an intent can be discovered [citing cases]. In *State* v. *McBrayer,* 98 N. C. 619, 2 S. E. 755, in considering a statute prohibiting a sale of intoxicating liquor, the court said: 'It is a mistaken notion that positive, willful intent, as distinguished from a mere intent, to violate the criminal law is an essential ingredient in every criminal offense, and that where there is the absence of such intent there is no offense; this is especially so as to statutory offenses. When the statute plainly forbids an act to be done, and it is done by some person, the law implies conclusively the guilty intent, although the offender was honestly mistaken as to the meaning of the law he violates. When the language is plain and positive, and the offense is not made to depend upon the positive, willful intent and purpose, nothing is left to interpretation.' " After citing many other authorities, the court concludes: "Though in every public offense there must exist a union of intent and act (Rev. Codes, sec. 8112), in statutory offenses, such as this, the intent is conclusively presumed, when it is shown that the statute has been violated."

It is therefore apparent that the intention of the writer of the objectionable article, in deliberately writing the same, or of the printer, or of those persons who deliberately publish the articles so written or printed, is wholly immaterial and not an ingredient of the crime charged, and therefore the court committed no error in sustaining objections to questions concerning such intent, whether propounded to prospective jurors or to witnesses.

Specifications 70 and 71 are based on the court's refusal to [7] include in the instructions the provisions of sections 8112 and 8113 of the Revised Codes; instead, the court gave the following, as instruction No. 8: "The court instructs the jury that in every crime or public offense, there must be a union or joint operation of act and intent, but that in statutory offenses, such as the case on trial, if the state first proves, beyond a reasonable doubt, that the statute has been violated, then the intent above mentioned is conclusively presumed."

While, ordinarily, the statutory provisions concerning intent should be given, as offered by the defense, the offered instructions were intended to apply to the intent heretofore discussed, and, as offered for that purpose, the court did not err in its [8] refusal. Instruction No. 8, however, while it follows the language used in *State ex rel. Rowe* v. *District Court, supra,* in the statement of a principle of law, is, as an instruction, inapt and incorrect and is misleading to the jury; it does no more than to advise the jurors that, if the defendant is proven guilty, a guilty intent is "conclusively presumed." Of what aid was the instruction to the jury? The question for them to solve was: Did the defendant violate the provisions of the statute? Its determination involved the questions as to whether the article was published by the defendant and was "calculated" to "incite or inflame resistance," *etc.* And if the intent to incite and inflame resistance was the only element of intent which could enter into the commission of the act, it might be said that, though erroneous, the instruction could not have prejudiced the defendant, for it could not then have

had any effect on the minds of the jurors in arriving at a verdict.

However, section 7961, Revised Codes, provides that "the following presumptions, *and no others,* are deemed conclusive: 1. A malicious and guilty intent, from the deliberate commission of an unlawful act, for·the purpose of ·injuring another." While section 7962 provides: "All other presumptions are satisfactory, if uncontradicted. They are denominated dis‡ putable presumptions, and may be controverted by other evidence. The following are of that kind:  *  *  *  2. That an unlawful act was done with an unlawful intent." Now, while a malicious and guilty intent is conclusively presumed from the *deliberate* commission of an unlawful act for the purpose of injuring another, the element of intent which must enter into the commission of the crime here charged, does not come within that classification: *i. e.,* the general intent, *viz.,* to publish the article in question.

This brings us to the consideration of specification 66, the **[9–11]** defendant's offer to prove that he did not "on August 16, 1918, or at any other time, intend to *publish, write, print, or utter the editorial* entitled 'The State Council Again,' or any other article of similar import." The "deliberate commission" of an act necessarily includes the intent to commit the act. The presumption that "an unlawful act was committed with an unlawful intent" is disputable, and, considered as evidence, "may be controverted by other evidence." While the publication of the article entitled "The State Council Again" might be punishable under subdivision 3 of section 1, as heretofore divided, a conviction could be had only if the act was deliberately or ·intentionally .committed, and, although the intent to publish the article might be drawn from the surrounding facts and circumstances, if the defendant was in the possession of facts from which the jury might have reasonably drawn the conclusion that he did not intend to publish the article at all, as, for example, that it was published without his knowledge or against his express command, or through the negligence

or misconduct of an employee, those facts should have gone to the jury, to be weighed against the disputable presumption of intent arising from the commission of the act. This the court did not permit, but, without discrimination, sustained objections to all questions concerning any intent whatsoever. Thereupon defendant made his offer, and the court, consistently, sustained the state's objection. The objection should have been overruled, and the facts, if any the defense had, admitted, to be considered under appropriate instructions on the subject. The court's failure to do so was erroneous.

Specification No. 100 predicates error on the court's refusal [12] to give offered instruction 38, which, if properly drawn to cover the question just discussed, would have been proper; but, as it appears from the testimony that Smith was the vicepresident of the company publishing the article, a greater burden was upon him than that defined in the proposed instruction. We apprehend that "mere failure to prevent its publication" would not exonerate the accused, had he known of the proposed publication in time to prevent it, and therefore the court was justified in refusing the proposed instruction.

In specification No. 102, the appellant urges that the court [13–16] erred in giving instruction No. 4, which reads as follows: "You are instructed that the crime of sedition as applied to this case is complete if you find from the evidence, beyond a reasonable doubt, that at the county of Lewis and Clark, state of Montana, at any time subsequent to February 22, 1918, and prior to the filing of the information herein, and while the United States be engaged in war, the defendant did unlawfully, willfully, wrongfully, feloniously, and seditiously do or commit any of the following acts, to-wit: Utter, or write, or print, or publish any language calculated to incite or inflame resistance to any duly constituted state authority in connection with the prosecution of the war." It is urged that the instruction does not properly apply to the facts; that there is no evidence that the defendant did utter, write, or print any language, but was responsible, if at all, only for the publication;

and that the instruction does not confine the issues to language calculated to incite or inflame resistance to the Montana Council of Defense.

While the instruction is approximately a correct statement of an abstract rule of law, and would have been harmless, had it been followed by other instructions applying that law to the facts in this case, the record discloses no such instructions, while the instruction given advises the jurors that they may find the defendant guilty if they find that he had, at any time between February 22, 1918, and the date of the filing of the information, uttered, written, printed or published, in Lewis and Clark county, *any language* calculated to incite or inflame resistance *to any duly constituted* state authority in connection with the prosecution of the war. "Although an instruction may state a correct principle of law, if it is not based upon or in conformity with the issues or facts raised or supported by the evidence, it is erroneous." (16 Corpus Juris, 1043, and note.) "In reading the statute, it is error for the court to read that portion thereof which does not define the crime charged, but defines another and distinct crime, unless he expressly limits the application of the statute to the charge." (12 Cyc. 614, and note.)

In determining the correctness of instructions, the rule is that they must be examined in their entirety, and where, as a whole, they correctly state the law and where those instructions general in their nature, are by specific instructions limited to the facts in the case, error cannot be predicated on an incomplete or too general instruction. (*State* v. *Brooks,* 23 Mont. 146, 57 Pac. 1038; *Territory* v. *Hart,* 7 Mont. 489, 17 Pac. 718.) We have searched the record in vain for an instruction limiting the one under consideration to the facts of this case.

No attempt was made to prove that Smith either wrote or printed the article complained of in Lewis and Clark county, and he could be convicted, if at all, only of its publication in that county; and, of course, he could not be convicted on proof of the writing, printing, uttering or publication of any article

other than that set out in the information, no matter how vicious or seditious such article might have been. In a prosecution of this nature, proof of other acts are admissible for certain purposes; but, under such an instruction as we are considering, the accused might be convicted of the commission of *any* act of a similar nature, though the proof utterly failed to establish his guilt of the crime charged. That this cannot be is elementary. An information must charge but one offense, and the accused can be convicted only of the offense so charged. As was stated in the case of *State* v. *Gaimos,* 53 Mont. 118, 162 Pac. 596: "When the information fixes a date, and the evidence shows an act of the character charged as a crime at that time, the state cannot be allowed to claim a conviction under that information for a similar act at some other time."

In the absence of an instruction directing the jury to return a verdict based upon the specific offense charged in the information, instruction No. 4 was prejudicially erroneous. "An instruction should be so explicit and so closely connected with the facts of the case as to enable the jury to apply the law to the facts. It must present the law substantially and correctly and in such a way that it will be understood by the jury." (12 Cyc. 645; *Ritte* v. *Commonwealth,* 18 B. Mon. (Ky.) 35; *Farrar* v. *State,* 29 Tex. App. 250, 15 S. W. 719; *Ashlock* v. *State,* 16 Tex. App. 13.)

In instruction No. 17 the court advised the jury that "It is not necessary to prove all three of the acts mentioned, to-wit, write, print, publish; but it is sufficient if the state proves any one of these, *viz.,* that the defendant wrote, or that the defendant printed, or that the defendant published the language complained of in Lewis and Clark county, Montana." In so far as it covers the subject, the instruction correctly stated a general proposition of law; but, as there was no evidence adduced and no contention on the part of the prosecution that the defendant either wrote or printed the article complained of, the instructions should have been limited to the question of publication in Lewis and Clark county.

"The sufficiency and correctness of instructions must be determined with reference to the evidence, and therefore a charge which asserts correctly an abstract proposition of law, but is not applicable to the evidence, or which is based upon the assumption of the existence of material facts of which there is no evidence, should not be given." (12 Cyc. 651.) In the absence of any evidence tending to prove that the defendant either wrote or printed the article complained of in Lewis and Clark county, it was error to instruct the jury that he could be convicted of either writing or printing the article. Such an instruction could serve no good purpose, and, in the absence of evidence on which to base it, the instruction should not have been given, as it could only tend to mislead and confuse the jury.

Error is predicated upon the court's ruling permitting the [17] witness Winters to testify from a transcript made by him of his shorthand notes concerning proceedings had before the State Council of Defense, upon the ground that the notes, and not the transcript, constituted the best evidence. The witness, however, stated that his original notes had not been preserved, and, in effect, that the transcript was an accurate reproduction of translation thereof. As said by the supreme court of Indiana, in the case of *Bass* v. *State*, 136 Ind. 165, 36 N. E. 124: "When the official stenographer is called, * * * his shorthand notes must be translated, either by himself or someone else who is able to do so. It being necessary that they should be translated, we think it wholly immaterial whether it is done orally or in writing. In this case it was done in writing. There is no claim that it was not done correctly. We think the court did not err in permitting Spencer [the stenographer] to read a transcript of the evidence." (See, also, *Barber* v. *State*, 64 Tex. Cr. 96, 142 S. W. 577; *Mackmasters* v. *State*, 83 Miss. 1, 35 South. 302; *State* v. *Gentry*, 86 Kan. 534, 121 Pac. 352; *Fletcher* v. *State*, 20 Wyo. 284, 123 Pac. 80.)

It is true that the county attorney did not lay a very complete foundation for the introduction of the testimony, and it

also appears that, when the defendant's attorney sought to
question the witness concerning the accuracy of the transcript,
the court refused to permit it. As the case must be reversed
on other grounds, it is not necessary to go into this matter in
detail. While it is better practice for the stenographer to read
from his notes, we can see no objection to permitting him to
testify from the transcript, in the event a sufficient foundation
is laid establishing his ability to report the testimony accurately,
the accuracy of the notes and transcript, allowing the defend-
ant to inquire fully into the matter to test the stenographer's
competency and accuracy, with the right to insist upon the
production of the original notes if such are in existence, and,
if necessary, to require the stenographer to read from his notes,
to test the accuracy of the transcript. A liberal cross-exami-
nation should be permitted, and, if timely application is made,
the defendant should be permitted the right to ask preliminary
questions to test the accuracy of the notes and transcript.

The article which is the basis of the charge against the
**[18]** defendant appeared as an editorial in the "Weekly Bulle-
tin" of August 16, 1918. Upon the trial, with the witness
Winters on the stand testifying concerning certain statements
made by the defendant before the State Council of Defense,
which were reported stenographically by the witness, Winters
read from a transcript of his notes the following, to which ob-
jections were made and overruled: "Q. 'Were you responsible
afterward for publishing the statement that you knew nothing
about this order that appeared in the August 3 issue, I think
it was, or September 3? Mr. Smith: Yes. Mr. Campbell: In
black type? Mr. Smith: Yes; Mr. Dunn wrote it. I asked
him to write it. Mr. Campbell: You are absolutely responsible
personally? Mr. Smith: Personally responsible. Mr. Camp-
bell: For the editorial that Mr. Dunn wrote and the denial of
the fact that you had ever received notice? Mr. Smith: Yes,
sir.'" Later, a motion to strike this testimony from the record
was made, upon the ground that the same did not refer to the
publication constituting the offense with which the defendant

was charged. In connection with the motion the defendant's attorney said: "That does not refer to the editorial here in question. The County Attorney: We submit that it does. The Court: Yes. I overrule the motion to strike."

From a reading of the testimony above set forth, it plainly appears that defendant admitted his responsibility for writing the editorial of September 3; but the court and county attorney assumed that the defendant admitted responsibility for writing the editorial of August 16. The introduction of this testimony standing by itself, and the refusal of the court to strike the same, might be regarded as harmless error; but in view of the court's instruction numbered 4, in which the jury were advised that the crime was complete if the defendant wrote, printed or published "any language," *etc.*, the testimony should have been excluded. In addition, the error was emphasized by the remarks of the county attorney and the court's affirmation of the same in the words used in denying the motion to strike, thereby leading the jury to believe that the defendant, before the State Council of Defense, admitted his responsibility for printing the language set forth in the information.

W. F. Dunn, a witness for the defendant, was asked on [19] cross-examination if he had not been convicted of sedition, and over objection was required to answer and answered in the affirmative. Complaint is made of the court's ruling, but it was clearly correct. (Sec. 8907, Rev. Codes.)

Finally, it is urged that the evidence is insufficient to sustain the verdict. It is to be remembered that the constitutional [20, 21] guaranty of free speech and free press was not suspended by the war, and that no one lost his right to criticise either men or measures. It is only for an abuse of the liberty that one may be called to account for his language, either in peace or in war. Under the stress of war the legislature may define the limits of liberty of speech and make punishable the use of language which in time of peace it would be powerless to restrain, and this is just what was done by the enactment

of the Sedition Act. Under that provision of the statute now before us, it was declared that the use of language calculated to incite or inflame resistance to a duly constituted federal or state authority in connection with the prosecution of the war constituted an abuse of the liberty of speech and press and a crime against the commonwealth.

Though the information charges that the editorial in question was written, printed and published in Lewis and Clark county, there is not any evidence that it was either written or printed here. Eliminating those elements of the charge, and the material allegations of the information now to be considered are: (1) That the editorial was published in Lewis and Clark county; (2) by the defendant; and (3) that it was calculated to incite or inflame resistance to the Montana Council of Defense in connection with the prosecution of the war. The defendant's plea of not guilty put in issue every one of those allegations and imposed upon the prosecution the burden of proving every one of them by competent evidence, beyond a reasonable doubt.

[22] The allegation that the editorial was published in Lewis and Clark county was indispensable, in order to give the court of that county jurisdiction to try the case, for the Constitution (Article III, section 16) secures to everyone accused of crime the right to "a speedy, public trial by an impartial jury *of the county or district* in which the offense is alleged to have been committed," subject only to the right to a change of venue. This is one of the fundamental guaranties of our Bill of Rights, intended to be honored by its observance, and not defeated by any subterfuge.

The allegation that the published editorial was calculated to [23] incite or inflame resistance to a duly constituted federal or state authority in connection with the prosecution of the war was equally necessary in order to state a public offense. In our judgment, the word "calculated" was used advisedly and with appreciative discrimination. After a more critical examination and analysis of the statute, we are satisfied that it was intended to be understood to mean "likely to produce a

certain effect, whether intended or not." The observations
heretofore made upon the subject "intent" render further dis-
cussion of this matter unnecessary.

The only evidence in support of the allegation that the edi-
torial was published in Lewis and Clark county was given by
Mr. Will A. Campbell, who testified that he was a subscriber
to the "Bulletin"; that he received his copy of the paper con-
taining the editorial in the due course of the mail, at his office
in Helena; that the paper came to him inclosed in a separate
wrapper; that he read the editorial in this county; and that he
was then a member of the Montana Council of Defense. The
[24] attorney general directs our attention to an admission
made by the defendant before the Council of Defense on Sep-
tember 9, 1918, to the effect that the "Bulletin" had subscribers
in Lewis and Clark county; but the evidence discloses that the
witness referred to the "Bulletin," then issued as a daily paper,
and evidence of the extent of the circulation of the "Daily
Bulletin" on September 9 would not constitute evidence of the
circulation of the "Weekly Bulletin" on August 16.

We may assume, for the purposes of this appeal, that the
evidence is sufficient to show *a* publication of the editorial in
Lewis and Clark county, using the term "publication" in the
broad sense of divulgation, promulgation or making known.
But it is not every abusive or even libelous statement that
[25] constitutes sedition. The language of this editorial
might be published in time of war under such circumstances
that would not make it a crime. (*Frohwerk* v. *United States,*
249 U. S. 204, 208, 63 L. Ed. 561, 39 Sup. Ct. Rep. 249.) To
illustrate from this record: It appears from the evidence that
Mr. Campbell exhibited the editorial to the county attorney,
and that afterward it was reprinted in the "Helena Indepen-
dent," a newspaper of which Mr. Campbell is the guiding
genius. In each instance there was a publication, but not such
a publication as constituted a crime. In other words, to bring
the publication under the condemnation of the statute, it must
have occurred under such circumstances that the language thus

published was calculated to incite or inflame resistance to a
duly constituted federal or state authority in connection with
the prosecution of the war. Whether it was or was not cal-
culated to have had that effect was a question of fact to be
determined by the jury (*State* v. *Kahn,* above) from all the
surrounding facts and circumstances, including the manner
and extent of publication, as well as the inherent quality of the
language itself.

So far as this record discloses, the defendant was not respon-
sible for the editorial becoming known to any person in Lewis
and Clark county, other than Mr. Campbell, who was then a
[26]  member of the Montana Council of Defense. Can it be
said, then, that in the hands of Mr. Campbell alone the pub-
lished editorial was calculated to incite or inflame resistance
to the council? Who but Mr. Campbell could be incited or in-
flamed to resistance, and is it within the range of probabilities
that he would be incited to resist the very organization of which
he was a member? We think not.

In the purpose sought to be accomplished and in the means
employed to effectuate that purpose, our Sedition Act is not
unlike the espionage statute (U. S. Comp. Stats. 1918, Comp.
Stats. Ann. Supp. 1919, secs. 20212a–20212h) passed by the
Congress of the United States, and concerning a prosecution
under that statute the supreme court of the United States said:
"The question in every case is whether the words used are used
in such circumstances and are of such a nature as to create a
clear and present danger that they will bring about the sub-
stantive evils that Congress has a right to prevent." (*Schenck*
v. *United States,* 249 U. S. 47, 63 L. Ed. 470, 39 Sup. Ct. Rep.
247.) Applying that rule and paraphrasing the language of
this court in *State* v. *Kahn,* above, could the jury find from the
evidence, beyond a reasonable doubt, that the natural tendency
and reasonably probable effect of the editorial, in the hands
of Mr. Campbell alone, was to incite or inflame resistance to
the Montana Council of Defense in connection with the prose-

cution of the war? The bare statement of the proposition would seem sufficient for its own complete refutation.

In failing to prove that the defendant was responsible for the editorial being made known in Lewis and Clark county to any person other than a member of the Montana Council of Defense the state failed to prove the offense charged in the information. For the reasons given, the judgment is reversed, and the cause is remanded to the district court of Lewis and Clark county for a new trial.

*Reversed and remanded.*

Mr. Chief Justice Brantly, being absent, takes no part in the foregoing decision.

(Submitted April 16, 1920. Decided May 3, 1920.)

*Messrs. Wheeler & Baldwin,* for Appellant, submitted a brief; *Mr. Baldwin* argued the cause orally.

*Mr. S. C. Ford,* Attorney General, and *Mr. Otto A. Gerth,* Assistant Attorney General, for Respondent, submitted a brief; *Mr. Gerth* argued the cause orally.