STATE, RESPONDENT, v. DAHLGREN, APPELLANT.

(No. 5,727.)

(Submitted September 15, 1925.   Decided October 3, 1925.)

[239 Pac. 775.]

*Criminal Law—Banks and Banking—Making False Report to State Bank Examiner—Evidence—Insufficiency—Certificate of Probable Cause.*

Banks and Banking—Making False Report to State Bank Examiner—Evidence—Insufficiency.
1.  Evidence in a prosecution against the officer of a bank under section 6077, Revised Codes of 1921, for willfully and knowingly making a false report of the bank's condition to the state bank examiner, *held* insufficient to warrant conviction.

Same—Correct Instruction.
2.  Instruction in a prosecution for making a false report of a bank's condition to the state bank examiner, that the state was required to prove beyond a reasonable doubt (1) that a false report was made, (2) that the defendant at the time it was made knew it to be false, (3) that it was made with intent to deceive the examiner, and (4) that it was willfully made, correctly stated the law.

Criminal Law—Certificate of Probable Cause—Effect—Duty of District Court to Issue, When.
3.  The effect of a certificate of probable cause granted to one convicted of crime pending appeal, is to suspend execution of the judgment and entitles defendant to his liberty upon furnishing bond, and the certificate should be granted by the district court whenever the question whether or not the conviction will be sustained on appeal is fairly debatable, thus avoiding the necessity of defendant applying to the supreme court for relief in that behalf.

---

Banks and Banking, 7 C. J., sec. 194, p. 574, n. 77; p. 576, n. 83.
Criminal Law, 17 C. J., sec. 3383, p. 109, n. 66, 71.

*Appeal from District Court, Missoula County; Asa L. Duncan, Judge.*

JOHN DAHLGREN was convicted of making a false report to the superintendent of banks as to the financial condition of the bank of which he was an officer, and appeals from the judgment and the order refusing him a new trial. Reversed and remanded, with directions to dismiss the case and discharge the defendant.

*Mr. Harry H. Parsons* and *Mr. Fred W. Schilling,* for Appellant, submitted a brief; *Mr. Parsons* argued the cause orally.

The jurisdiction of the state court is challenged for the reason that the unquestionable proof shows that the American Bank and Trust Company was a member bank of the Federal Reserve Banking System. Our contention is that being such a bank, any crime committed by any officer thereof and appertaining thereto is cognizable only in the federal courts; that their jurisdiction is exclusive; and that the state courts are without right or authority to entertain an action such as the one at bar. (*Easton* v. *State of Iowa,* 188 U. S. 220, 47 L. Ed. 452, 23 Sup. Ct. Rep. 288 [see, also, Rose's U. S. Notes]; *Charters* v. *United States,* 289 Fed. 63; *Shaw* v. *United States,* 292 Fed. 339; *In re Eno,* 54 Fed. 669; *People* v. *Fonda,* 62 Mich. 401, 29 N. W. 26; *Bower* v. *United States,* 296 Fed. 694; *United States* v. *Jenks,* 264 Fed. 697.)

The evidence is insufficient to warrant conviction. Taking this case at its worst, all that can be said or claimed by the state is that there is an explanation due from the appellant as president of the bank as to its methods of conducting business. Bad bookkeeping, bad system of doing business, never connotes criminal intent. Mistakes of the grossest character and kind, radical departures from the ordinary course of business and even questionable methods of transacting business never have and never will legally impute crime. A pertinent decision citing others of like import is found in the case of the *State* v. *Givens,* 28 Idaho, 253, 152 Pac. 1054, wherein we find the following language, to-wit: "It must be admitted that the method adopted by the officials of the bank of Nampa in keeping the accounts of the bank were subject to explanation, and not such as with safety to depositors could be universally adopted by other banks in the state. Yet, however irregularly the books of the bank may have been kept, that fact alone would not justify a conviction of appellant of willfully, and feloniously making

a false report of the condition of the bank. In order to warrant a conviction of appellant of the offense with which he stands charged, it must be proved beyond a reasonable doubt that he made or attested a false report of the condition of the bank of Nampa, and that he know such report to be false when he made it." (See, also, *State* v. *Mason,* 61 Kan. 102, 58 Pac. 978; *State* v. *Jackson,* 20 S. D. 305, 105 N. W. 742.)

*Mr. L. A. Foot,* Attorney General, and *Mr. I. W. Choate,* Assistant Attorney General, for the State, submitted a brief; *Mr. Choate* argued the cause orally.

The contention that since the American Bank and Trust Company was a member bank of the Federal Reserve Banking System, any crime committed by an officer thereof appertaining thereto is cognizable only in the federal courts cannot be maintained. The infirmity in the contention advanced by appellant lies in the failure to distinguish between the exercise of powers conferred by the federal government and those conferred by the state law. A state bank does not by the mere act of becoming a member bank of the Federal Reserve Banking System cease to be a state bank, nor does it cease to be amenable to state laws regulating state banks. Such a member bank must, under section 5213, Revised Statutes of the United States, make designated reports to the comptroller of the currency. This duty does not, however, relieve the bank from its obligation to make reports to the state bank examiner of Montana, and for the making of such reports the bank and its officers are amenable to the laws of Montana just as they are still subject to the laws of this state regarding the conduct of its business in other respects. An examination of the authorities cited in appellant's brief discloses that they are either not in point or wholly consistent with the principle contended for by respondent.

In his brief, appellant states correctly, we think, the law applicable to the specification having to do with the insufficiency of the evidence: "Confessedly no express purpose or

intent to make a false report was proven or established. This
is unnecessary insomuch as the intent may be gleaned and
inferred from proper facts and circumstances surrounding the
transaction.''

We do not see how under the evidence in this case any
escape can be had from the conclusion that the defendant
did make a false report and, as stated by appellant above, the
question of the intent with which the report was made is a
conclusion to be gathered from the conditions surrounding
the making of the report. As to the making of the false
report itself, the record seems to be incontrovertible. It is
clear from the testimony that the cashier's check for $20,000
was included in the report to the state bank examiners as
cash, when in fact it was not cash but possessed no value
whatever and was included for the purpose of padding the
report. As to whether the issuing of a cashier's check which
represents no value whatsoever and its deposit in the vaults
of the bank as cash on hand was done in good faith, or with
the intent to deceive, was a question of fact to be decided by
the jury from all the circumstances of the case and taking into
consideration the explanation of the affair given by the defend-
ant.

MR. JUSTICE GALEN delivered the opinion of the court.

John Dahlgren was by information charged with the crime
of making a false report and statement of facts to the superin-
tendent of banks as to the financial condition of the American
Bank & Trust Company, a domestic corporation engaged in the
banking business at Missoula, of which he was the president
and a director. It is averred that during the month of April,
1923, the state superintendent of banks called upon the afore-
mentioned bank to furnish him with a report showing its finan-
cial condition at the close of business April 3, 1923, and that
in response thereto the accused did on the thirtieth day of
April, 1923, make, or cause to be made, a report containing

material statements which were false and were at the time known by him to be false. Specifically it is charged that for the purpose of making such report he caused to be issued by, and delivered to the bank, a cashier's check dated March 27, 1923, in the sum of $20,000, payable to its order, which was carried and shown as cash, whereas it was neither represented by cash in the bank nor otherwise available. Upon his plea of not guilty, the cause was tried to a jury, which found the defendant guilty as charged, leaving punishment to be fixed by the court. The court sentenced the defendant to a term of imprisonment at hard labor of not less than four and one-half nor more than nine years in the state prison, and judgment was entered accordingly. The appeal is from the judgment and from an order denying defendant's motion for a new trial.

The statute upon which the information is predicated reads as follows: "Every officer or other person authorized by this Act, who willfully and knowingly makes any false statement of facts, statement of account, or report, and every officer, agent, or clerk of any bank who willfully and knowingly makes any false entries in the books of such bank or knowingly subscribes or exhibits false papers, with the intent to deceive any person authorized to examine such bank, and every person authorized by the provisions of this Act to make statements or reports, who willfully and knowingly subscribes or makes any false statement or report, shall be deemed guilty of a felony, and, upon conviction thereof, shall be imprisoned at hard labor in the state prison for a term of not less than one nor more than ten years." (Sec. 6077, Rev. Codes 1921.)

Many assignments of error are specified and urged upon [1] this court as reason for disturbing the judgment, but, in our view of the case, only one need be considered: Is the evidence sufficient to establish the commission of the crime charged?

From a careful review of the record it appears that the American Bank & Trust Company of Missoula is a banking corporation organized under and by virtue of the laws of Montana, with an authorized capital of $100,000, and that, between September 1, 1922, and April 15, 1923, John Dahlgren was the president and Fred Bedard the cashier thereof. It failed to open its doors for business on the twenty-fifth day of January, 1924, by reason of an order made by its board of directors suspending business, and it was later placed in charge of a receiver for liquidation.

Counsel for the state attempted to make out a *prima facie* case against the defendant by the introduction of a statement made to the superintendent of banks on April 30, 1923, pursuant to call purporting to show the financial condition of the bank as of date April 3, 1923, and proof as to the fraudulent character of such report. In the report complained of, State's Exhibit 8, the items disclosed thereby charged to be fraudulent are the following: Under the head of "Resources," an item of "currency $35,282" is shown, and, under the schedule of "liabilities," cashier's checks are listed at $39,491.09. To make up the amount of currency available, as listed in the report, it appears that a cashier's check, dated March 27, 1923, for the sum of $20,000, was issued by the bank, payable to its order, and by it carried and counted as cash on hand as of the date of the report. This appears as Plaintiff's Exhibit 20. This cashier's check, as shown by the stamped impression thereon, appears to have been fully paid on April 6, 1923.

S. L. Kleve, assistant superintendent of banks, testified that on April 6, 1923, a call was made upon the American Bank & Trust Company by the superintendent of banks to report its condition on forms prescribed, at the close of business April 3, 1923, and that, in pursuance of such call, the report made the basis of the charge, State's Exhibit 8, was submitted. It is disclosed by his testimony that the published statement made by the bank, showing the condition of its business as of date

April 3, 1923, shows the identical items upon which the information filed herein is predicated. Earlier reports made by the bank to the superintendent of banks pursuant to call were admitted, showing transactions similar to the one under investigation. The witness testified that all these reports, including Exhibit 8, appear regular on their face, that there is nothing therein contained to indicate any fraud. He stated that there was no way of determining the actual amount of cash on hand at any particular time prior to the date of the report; that, where one bank obtains $20,000 cash from a neighboring bank and repays the same in the course of the day, that transaction would not necessarily be shown upon the books of either bank, and as to whether such a transaction is reported depends entirely upon the arrangement between the two banks.

The report in question was signed by John Dahlgren, E. C. Mulroney and C. F. Peterson as directors of the bank, and was sworn to by Fred Bedard, cashier, on April 30, 1923. The paying teller and two of the bookkeepers employed by the bank during the years 1922 and 1923, were called as witnesses for the state. In substance their testimony is to the effect that the amount of currency available in the bank as of date March 26, 1923, was raised to the extent of $20,000, due to the issuance of the cashier's check in evidence for like amount, dated March 27, 1923, and that, as an offset to this item, under the head of "Liabilities," the sum of $20,000 was added under the head of "Cashier's Checks," so that on Saturday, the twenty-fourth day of March, 1923, the cash on hand, as shown by the daily statement of the bank, was $29,671.64, and on Monday following, March 26, 1923, the cash on hand as shown by the books was $51,231.39; an increase being shown of $21,559.75. The cashier's check in question is in the handwriting of Fred Bedard, the cashier, and had the effect of raising the cash $20,000. The books did not always balance, and many times in bringing them to a balance in closing the day's business errors would be found which were sometimes detected in the

cash; it being found that cashier's checks so issued had not been included. Sometimes either Mr. Dahlgren or Mr. Bedard would direct that the books be held open for a time toward the close of the day's business, and then the witnesses would be told to list in the cash items cashier's checks running at different times from $10,000 to $20,000, which were counted as cash.

As to whether there was cash available in the vault of the bank or in the Western Montana National Bank across the street to meet such cashier's checks when issued, the witnesses disclaimed any personal knowledge. There was evidence to the effect that like transactions occurred many times during the years 1922 and 1923. Mr. Dahlgren was away a good part of the time in the years 1922 and 1923 on outside work, and during such times Mr. Bedard was in charge and gave instructions to the employees of the bank, including the book-keepers.

The cash in the bank fluctuated from day to day thousands of dollars. Within the knowledge of the witnesses, by some arrangements made, money was obtained from the Western Montana National Bank from day to day as high as $15,000 or $20,000 at a time, and some days, when the pressure was high enough, the Western-Montana National Bank would advance to the American Bank & Trust Company as much as $10,000 to $15,000 two or three times in the one day; and, as to whether such items were paid back each and every day, the witnesses had no personal knowledge. When an examination was made of the bank by the superintendent of banks, there would be no way by which the bank examiner could tell the amount of cash on hand on any particular date, so that, upon the report of the bank's condition as of date April 3, 1923, on an examination subsequently being made, the bank examiners would not be able to tell whether the amount of cash as actually reported was then available. Mr. Dahlgren and Mr. Bedard at different times would direct the

bookkeepers to raise the cash and to make an offset entry by showing the cashier's check issued for like amount, payable "to ourselves," of equal date. The purpose of carrying the cashier's checks in the till was to increase the amount of cash on hand in the vault, and, when these cashier's checks were paid, the amount shown under the head of "Currency" in the resource column would be depleted to that extent. As to why the cashier's check in question for $20,000 and others were issued from time to time, payable to "ourselves," the witnesses had no knowledge, and did not know the particular arrangements made with the Western Montana National Bank for the advancement of the cash from day to day, nor how settlements were made between the two banks, nor whether there was money actually held in the Western Montana National Bank to the credit of the American Bank & Trust Company sufficient to meet the cashier's checks as issued by the latter bank from time to time, and particularly as to the check in question for the sum of $20,000.

Nellie Peterson, one of the bookkeepers and receiving teller between September 1, 1922, and June 1, 1923, who as a part of her duties kept the cashier's check-book, testified: "I don't know as to any errors made in counting the cash in the vault, because I didn't count that; so far as I know the cashier's checks always represented cash, were counted as cash, and cashier's checks were put in, and the money they represented was counted as cash. I do not, however, know that the cash was always available either in that bank or the bank across the street, that that cashier's check represented. I do not know whether it was or whether it wasn't. Some of these days, in making the correction, we would all look around, and the cashier's check would be overlooked, and then it would be in the teller's basket. If a big shipment of money came from the postoffice or from the Western Montana National Bank, as to that not being put in the till, but taken directly and put in the vault, I will answer that I don't always know what was done."

In substance, this constituted all of the evidence introduced by the state in support of the charge.

In defense and in rebuttal, the several transactions complained of were fully and fairly explained, entirely consistent with the state's evidence, by witnesses called, whose testimony is uncontradicted. Therefrom it clearly appears that the proof offered by the state in support of the charge falls far short of proving beyond a reasonable doubt, or at all, that the defendant willfully and knowingly made a false report with intent to deceive the superintendent of banks as charged.

Fred Bedard, cashier of the bank during the years 1922 and 1923, testified that the bank was in the general charge of Mr. Dahlgren, but that he superintended the business during Mr. Dahlgren's absence. He stated that his signature appears on the report dated April 30, 1923, State's Exhibit 8, and that the report was made up for the signature of the various officers and directors, whose names are subscribed thereto, by the head bookkeeper. As to the cashier's check made the basis of the charge, he testified: "My attention being directed to the cashier's check dated March 27, 1923, made payable to ourselves, for the sum of $20,000, signed by me, and which is identified in this case as Exhibit 20, I will say that this is a cashier's check for $20,000. This check was issued by me, and it was issued as an offset for an entry for some currency which we had in the Western Montana National Bank. At the time that check was issued for the $20,000, we had the currency for it in the Western Montana National Bank, and that cash was obtained by us the following day, or probably that day. We had occasion to go to that bank more than once a day; I wouldn't be in a position to say how often, but we went to it often. It is hard to answer, also, how much money we got from the Western Montana National Bank in one day, because we got it at different times and different amounts. The explanation of why this check is marked 'Paid' eight or nine days later is that we got some currency and issued the check, and ordered some more, and

just kept the same check, instead of canceling it and issuing another one. As I said a while ago, we would get the currency and we would make a check as an offset entry, because we didn't pay for the currency when we got it. One reason for the issuance of the cashier's check was that we had arranged for the money. * * * This check was not issued at any time for the purpose of raising cash, without having the cash either in the vault of the Western Montana National Bank or in our bank. This is a regular report, and the report is made because we would get a call from the superintendent of banks asking for a report as to the condition of our bank on a certain date. I couldn't tell you what date, in respect to time, they would usually call for, because we don't know. The call, however, was for a prior date; that is, they would make a call on a certain date for the condition as of a previous time; we do not know, and no banking officer knows, so far as I know, when those reports are going to be called; we had no way of estimating it, within a week, of when there would be [a] call. So far as I know, everything in that report is true. This is the same report that Mr. Dahlgren and Mr. Mulroney and Mr. Peterson attested. * * * There was never, in my experience, any cashier's checks issued for cash when there were not funds either in our bank or another bank to our credit or payable to us at any time. * * * When we borrowed money from the Western Montana National Bank two or three or four times a day, we paid it back the same day, with checks. We would pay the currency with Northern Pacific checks on the other banks which they might have drawn on themselves, or on other banks, or local banks here, but as a rule it was always Northern Pacific checks and drafts; if that is what that was given for there was cash on hand either in that bank or in ours, to pay it at any time. When cashier's checks were issued for that purpose, there was never any time when they were issued that funds were not immediately available to pay it. * * * When

cashier's checks were issued, and after they were marked
'Paid,' they were filed, and they were absolutely accessible.
to all the bank examiners that came along, and they were
likewise accessible to the directors, and they were accessible to
anyone in charge of the bank.  *  *  *  In case the check
happened to be outstanding at the time the report was made,
then the cash represented by this check was either in our
bank or the Western Montana National Bank, and we had it
arranged for.  When the cash was in the Western Montana
National Bank we got it any time we wanted it; that bank
was just across the street from our bank.  I don't know just
how long it would take us to get it, but probably ten minutes.
During all the time that I was there during these years our
bank never got below the reserve required by law, three per
cent and seven per cent, that I know of.  *  *  *

"Taking March 27, 1923, when the check for $20,000 was
issued, as to the effect on the cash on that day, the currency
went up $20,000; that was when we got the currency on
that date.  When the check was paid on April 6, 1923, the
cash went down $25,000.  *  *  *  When we went over to
the Western Montana National Bank, we didn't take these
checks, nor did we send the check over.  So far as I know
the Western Montana National Bank never saw one of these
checks; there wasn't any way for them to see it; the check was
always on our record, and never out of the possession of the
bank.  As to our never sending anything over there for the
money, or any other paper for the money, I will say that we
sent Northern Pacific checks, but we didn't send anything
when we went to get the money.  As to our simply signing an
I O U over there, I don't remember of ever signing anything
there; I don't remember ever signing a slip there for any
currency that I got.  *  *  *  Mr. Clark, cashier of the
Western Montana National Bank, would usually make out a
debit slip for the amount of the cash advanced and place
it in the drawer of the Western Montana National Bank until

the amount advanced was paid back. * * * Either Mr. Dahlgren or myself would arrange with the Western Montana National Bank by telephone for the amount of currency which we wanted from day to day, and then as we wished it we would send one of our bookkeepers or employees over across the street to get it. * * * Usually it was paid back the same day it was obtained, although in some instances we were compelled to carry it over. * * * Referring to this check for $20,000 dated March 27, being Plaintiff's Exhibit 20, and which is marked 'Paid' on April 6, on March 27 we made arrangements for $20,000, and, like I have heretofore testified, either I or Mr. Broman went over and got the $20,000, and at the end of the day we totaled up $20,000 worth of checks and took them back, and the debit slip that was made in the morning was torn up and the transaction was closed, so far as the bank and ourselves was concerned, as to that transaction. Then immediately after, Mr. Broman or myself would call up the bank over the phone and want to know if we could have $20,000 the next day; from March 27 to April 6 the amount was the same each day, $20,000. Then on the day that these were marked 'Paid,' as to our not needing any more money after that, I will say yes; we did, but we probably had enough on hand. * * * We got this money every day from the Western Montana, and we paid it back every day, and we didn't cancel, or didn't mark the check 'Paid' until the last day, when we didn't need any more money. That money that we got in the morning and paid back in checks at night we might have shipped that out; yes; it might have been shipped out. * * * Taking up Plaintiff's Exhibit 8, being the report of the condition of the business of the American Bank & Trust Company at the close of business on the third day of April, 1923, I would say that the check marked Plaintiff's Exhibit 20, being dated March 27, 1923, and being No. 8075, and stamped 'Paid April 6,' that that check was in our bank at the time when

this report was made out; the amount of cash represented by that check, $20,000, was contained in this report under the item or subdivision 'Cashier's Checks,' and is $39,491.09; the other place in which it appears in this report is in the cash, right here, under the item of currency, which is shown here to be $35,282. Of course if you took that $20,000 you would be just $20,000 less.''

The witness further stated that the practice of issuing cashier's checks for currency was discontinued about July 6, 1923. He testified that about that time ''Mr. Sterling came over to the bank and told Mr. Dahlgren that he wanted to change his method of handling the currency, and that we should take our checks over there before we got the money and to pay checks for our money when we got it.''

Mr. Dahlgren, in his own behalf, made like explanation of the transactions had with the Western Montana National Bank and the truthfulness of facts contained in the report in question made to the superintendent of banks. He testified: ''My attention being directed to State's Exhibit No. 20, which is a cashier's check No. 8075, payable to 'ourselves,' for $20,000, made out and signed by Fred Bedard, I know why that check was given; it was given for and issued as a credit against the currency that was in the bank in our vault or in the Western Montana National Bank. As to our system, from September, 1922, up until April 7, 1923, of getting currency during those times, well, we called them up on the phone and told them that we needed $20,000 in currency, and when they had it ready over there we would just go over and get it, but that time they didn't have it ready at that time, probably not until in the morning, and, in order to close our books, the cash-books that day, we had to put it on the books and issue the cashier's check. * * * If this check was issued for currency, we would have the currency on hand or in the Western Montana National Bank; we never issued one of them in which we did not have full provision made

that the money was either there, accessible, or in our own vault, accessible.''

In so-called rebuttal, F. T. Sterling, president of the Western Montana National Bank, admitted having advanced currency to the American Bank & Trust Company in large amounts from time to time during the years 1922 and 1923. He said that he could not give specific dates, as his bank kept no record of the money so advanced from day to day. The money was advanced primarily to enable Dahlgren's bank to cash Northern Pacific Railway checks, although it might have been used for other purposes. He testified: ''We furnished the currency to him, not just as we do to the other banks, but as we do to business houses; business houses come occasionally and get currency for the purpose of taking up checks and cashing checks. The defendant got the currency in varying amounts. The cashier would usually come for some currency at the opening of the banking house, or earlier, and it was customary that the checks cashed or the currency would be returned to our bank the same day. * * * As to the defendant not getting money from us with drafts, I will say that we advanced money to him through the day, whenever he asked for it, regardless of whether it was for Northern Pacific checks or not. As to our keeping no record of those, and having no recollection of how it happened, I will answer, we have not. We have no record of such entries, and, so far as I know, there was no record. We did not treat or consider such money advanced as a loan, and therefore made no charge on our books.''

In further attempted rebuttal, W. H. Clark, cashier of the Western Montana National Bank during the years 1922 and 1923, testified that, with respect to the cash advanced to the American Bank & Trust Company, he usually conducted such business with it, and that no entry was made in the books of the Western Montana National Bank respecting the transaction. He stated that usually the money would be repaid the

same day it was advanced, but that he could not say as to whether or not it was ever returned at any time after the vault was closed; that he did not remember of it ever having been paid back in cash, and stated that it was usually repaid with checks, so far as he recalled. He stated that he believed the arrangement for the money was sometimes made after banking hours for the advance of money to the American Bank & Trust Company the day following the one on which the request was made. He stated that the transactions were usually handled by putting a debit slip into the cash drawer, and, when the same was repaid by checks, such debit slip would be destroyed, and that that was the only record kept by the Western Montana National Bank; that the money so advanced was never considered as a loan. He testified: "Q. I will ask you whether or not as a matter of fact it would be an unusual transaction for your bank to let any bank or any party have money in the sum of $20,000 every day for a period of twenty days or for the period of eleven days for the purpose of cashing checks? A. Well, I don't know that it would be in that case, as they were in the habit of getting currency any time they wanted it, in any amount they wanted it."

The court correctly instructed the jury as to the essential [2] elements of the crime charged necessary to be established beyond a reasonable doubt by the state before a verdict of guilty would be warranted, as follows: "You are instructed that there are four things to be proven by the state beyond a reasonable doubt in connection with the making by the defendant of the alleged false statements in the report to the superintendent of banks as set forth in the information: (1) It must be proven that a false report was made; (2) that the defendant at the time the same was made knew the same to be false; (3) that the same was made with the intent to deceive a person or persons authorized to examine the bank; (4) that the same was willfully made. All the foregoing are essential to constitute the crime of making a false report charged by the information,

and must be proven by the state beyond a reasonable doubt before a conviction can be had. You are therefore instructed that, if you entertain a reasonable doubt from the evidence that the state has proven any one of these four essential facts in the information, you must find the defendant 'not guilty.' ''

This instruction is based upon the language of the statute (sec. 6077, Rev. Codes 1921), and constituted the law of the case. Applying it to the evidence, it is plain that the state wholly failed to establish a case sufficient to support the verdict. The explanations made by witnesses for the defense and those testifying in so-called rebuttal removed every vestige of suspicion that the report was false, known by the defendant to be false, or intended to deceive persons authorized to examine the bank as charged in the information. At most, the transactions as disclosed by the report in question and the cashier's checks issued, appear to have been irregular banking methods, sufficient to place a person interested upon inquiry. However, in view of the uncontradicted explanations made of these transactions, the alleged falsity of the report was wholly unestablished by the state. The American Bank & Trust Company, in its books and in its report, truthfully depicted its obligation in the sum of $20,000 on account of a cashier's check outstanding. Such check was made payable to the order of ''ourselves,'' but, had it been issued to the Western Montana National Bank, as would have been the usual and proper course, then no question whatsoever would or could have arisen concerning the *bona fides* of the transaction. The practice was discontinued in July, 1923, Mr. Sterling demanding that thenceforth, in advance of delivery of currency to Mr. Dahlgren's bank, cashier's checks should be by the American Bank & Trust Company issued payable to the Western Montana National Bank, and delivered.

There was no evidence introduced on the part of the state that the report of April 30, 1923, was not in fact true and correct in every particular, nor was there evidence to show

that the currency items complained of did not correctly show
cash immediately available. The report made to the superin-
tendent of banks by the American Bank & Trust Company,
as well as its published report, correctly disclosed the facts
as to items of currency by debit and credit entries. A lia-
bility was there disclosed an account of outstanding cashier's
checks, and, in making report thereof, there was no attempt
at concealment or falsification of the true facts. It appears
that there was no falsehood in the figures reported in the
bank statement to the superintendent of banks, nor was
any intended. The evidence of the witnesses for the defend-
ant and in rebuttal is consistent and a fair explanation
of the transactions made the basis of the charge.

The law as given to the jury in the instruction above
quoted constituted the law governing the case, and is a correct
pronouncement thereof. It was wholly disregarded by the
jury in rendering its verdict. From a complete review of the
evidence, it is plain that there was a total failure on the part
of the prosecution to establish beyond a reasonable doubt, or
at all, the essential elements of the offense charged. Upon the
state rested the burden of proof in order to sustain defend-
ant's conviction, and in that respect it met with dismal fail-
ure. We find nothing in the record to sustain the judgment.

The trial court not only denied the defendant a new trial,
[3]  but refused him a certificate of probable cause after he
had perfected his appeal to the supreme court. Pending de-
cision on appeal, such a certificate has the effect of suspending
the execution of the judgment, entitling the defendant to his
liberty upon furnishing adequate bond. In view of the
facts disclosed by this record, we cannot understand why
the trial court refused the defendant a certificate of probable
cause, as it appears to us that in application of the most
elementary principles of justice the defendant was clearly
entitled thereto. Being denied such privilege by the district
court, the defendant was compelled to make application to the

supreme court, and the certificate was thereupon issued by the Chief Justice. We think it was wholly unnecessary to cause the defendant such inconvenience, trouble and expense. The defendant has a constitutional right to have his case reviewed on appeal by the supreme court, and, since the question as to whether or not the judgment of conviction would be sustained was at least debatable, there was no good reason why the defendant should be compelled to be incarcerated in the state prison and there remain until decision rendered by this court on his appeal. This case furnishes an excellent illustration of the manifest injustice which may be done to a person convicted of crime, when from the record it is doubtful as to whether or not the judgment of conviction will be sustained upon appeal.

Section 12113, Revised Codes of 1921, authorizes the issuance of certificates of probable cause in proper cases. District courts should be more liberally disposed in the issuance thereof, and not compel a person convicted of crime to come to this court for relief pending disposition of his appeal. It is the settled rule in this state, pursuant to statute, that a certificate of probable cause staying execution of the judgment should issue without question, where from the evidence the question is fairly debatable as to whether or not the conviction will be sustained on appeal. (*State* v. *Broadbent,* 27 Mont. 63, 69 Pac. 323.) The record in this case presents a very pronounced case within the rule, and we think the certificate of probable cause should have been issued unhesitatingly by the district court.

The judgment is reversed and the cause is remanded, with directions to dismiss the case and discharge the defendant.

*Reversed and remanded.*

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES HOLLOWAY, STARK and MATTHEWS concur.