STATE, RESPONDENT, *v.* ASAL, APPELLANT.

(No. 6,096.)

(Submitted April 22, 1927. Decided June 11, 1927.)

[256 Pac. 1071.]

*Criminal Law—Banks and Banking—Making False Report to Superintendent of Banks—Indictment—Sufficiency—Offers of Proof—Business Custom of Banks—Erroneous Exclusion—Evidence—Copies of Pages of Bank Books—When Inadmissible—Instructions—Pleading and Proof—Immaterial Variance—Appeal—Theory of Case.*

Criminal Law—Banks and Banking—Making False Report to Superintendent of Banks—State must Prove Criminal Intent.
   1. In a prosecution against the cashier of a state bank under the provisions of section 6077, Revised Codes of 1921, which declares that every officer of a bank who knowingly exhibits or subscribes false papers, with intent to deceive the state bank examiner, is guilty of a felony, the intent to deceive is an essential ingredient of the offense charged and must be proven beyond a reasonable doubt in order to justify conviction.

Same—Appeal—Theory of Case.
   2. Where a case of the nature of the above was tried in the district court by the state's attorney on the theory that such intent was a part of the crime charged and had to be proven, he will not

79 Mont.—25

be heard on appeal to change the theory of the case by asserting the contrary.

Same—Indictment—Sufficiency.

3. Section 6074, Revised Codes of 1921, as amended by Chapter 84, Laws of 1923, provides for regular call reports to be made by state banks to the superintendent of banks as of a past day, and that such day shall be the day designated by the comptroller of currency of the United States for reports of national banks. *Held,* that an indictment, charging the submission of a false report, alleging that the superintendent had called for "a regular call report," was sufficient and not fatally defective for not alleging the day designated as of which the condition of the bank should be reported was a day designated by the comptroller of currency for reports of national banks.

Same—Reports to Superintendent of Banks—Statute—Constitutionality.

4. *Held,* that the statute providing for and requiring reports of the condition of state banks to be made to the superintendent of banks (sec. 6071 et seq., Rev. Codes 1921) is not unconstitutional as delegating to that officer legislative power.

Same—Making and Exhibiting Report of Condition of Bank by a Bank Officer, What Constitutes.

5. Subscribing a report to the superintendent of banks is a part of making the report and the mailing of it constitutes an exhibiting of it within the meaning of section 6077, Revised Codes of 1921, making the exhibition of a false report a felony.

Same—When Bank Officer Guilty of Making False Report to Superintendent of Banks.

6. Where a bank officer, when signing a report of the condition of his bank, believes it to be true, but thereafter learns that it was false and with such knowledge sends or knowingly permits it to be sent to the superintendent of banks, he is guilty of a crime.

Same—Error in Selection of Juror—Defendant cannot Complain if He Fails to Exercise Peremptory Challenge.

7. Where defendant in a criminal cause alleges error in the selection of a juror at a time when he still had an unexercised peremptory challenge but failed to exercise it, he may not complain on appeal that the action of the court resulted to his prejudice.

Same—Offers of Proof of Business Custom of Bank—Erroneous Exclusion.

8. *Held,* that offers of proof made by defendant bank cashier charged with transmitting a false report of his bank to the superintendent of banks, in that it reported an amount on deposit with an approved reserve agent greater than that actually in the hands of the latter on the day as of which the report was to be made, in an effort to establish a custom among state banks, known to and sanctioned by the superintendent, of charging remittances on their books the day they are made to correspondent banks, defendant asserting that an ample remittance had been mailed to a correspondent bank for deposit with the reserve agent but not deposited as instructed, were improperly excluded to the prejudice of defendant, such offers having been competent on the issue of intent, made an ·

---

6. Liability of bank officer for making false report, see note in 20 Ann. Cas. 948.

7. See 16 R. C. L. 291.

essential element of the crime by the statute (sec. 6077, Rev. Codes 1921).

Same—Intent—Evidence Admissible.

9. Any evidence tending to shed light on the intent or lack of intent on the part of one on trial for a crime, including his own, is competent.

Same—Evidence—Copies of Pages of Bank Books Inadmissible if Unauthenticated or Vouched for as Correct.

10. Copies of pages of books of a foreign correspondent bank, reconcilement statements, etc., found in an insolvent bank of which defendant was cashier prior to insolvency, unauthenticated or vouched for as correct, *held* to have been improperly admitted as exhibits in the prosecution of defendant for making a false report to the superintendent of banks.

Same—False Bank Report—Honest Mistake on Part of Defendant—What Proper Instruction.

11. In a prosecution of the nature of the above, the defendant is entitled to an instruction that if he made an honest mistake in his report to the superintendent of banks and believed it to be true, though in fact false, acquittal should follow.

Same—Pleading and Proof—Immaterial Variance.

12. Under the rule that where, because of an alleged variance between proof and information or indictment charging crime, the accused is not misled in making his defense or placed in danger of being twice put in jeopardy for the same offense, the variance is immaterial, *held* that where the indictment charged that defendant's report to the superintendent of banks showed an overdraft in a correspondent bank whereas the proof showed that his bank had there a credit of some $1,100, the variance was not fatal where the report showed a balance to its credit of $4,196, thus rendering it incorrect, which was the gist of the offense charged.

---

[1]  Banks and Banking, 7 C. J., sec. 12, p. 482, n. 63; sec. 194, p. 575, n. 78, p. 576, n. 83 New.
[2]  Criminal Law, 16 C. J., sec. 1583, p. 774, n. 48; sec. 1590, p. 778, n. 96.  17 C. J., sec. 3498, p. 190, n. 89 New; sec. 3544, p. 203, n. 92.
[3]  Banks and Banking, 7 C. J., sec. 194, p. 575, n. 79.  Criminal Law, 16 C. J., sec. 1018, p. 540, n. 59.
[4]  Banks and Banking, 7 C. J., sec. 194, p. 575, n. 77, p. 576, n. 83. Constitutional Law, 12 C. J., sec. 330, p. 847, n. 2.
[5]  Banks and Banking, 7 C. J., sec. 194, p. 574, n. 77, p. 576, n. 83, 84 New, 85 New.  Exhibit, 25 C. J., p. 167, n. 34 New.
[6]  Banks and Banking, 7 C. J., sec. 194, p. 576, n. 83.  Criminal Law, 17 C. J., sec. 3593, p. 254, n. 51.
[7]  Criminal Law, 17 C. J., sec. 3634, p. 293, n. 48.
[8]  Banks and Banking, 7 C. J., sec. 194, p. 576, n. 84, 85 New.
[9]  Criminal Law, 16 C. J., sec. 1034, p. 543, n. 46; sec. 1096, p. 565, n. 69.  17 C. J., sec. 3679, p. 334, n. 4.
[10]  Banks and Banking, 7 C. J., sec. 194, p. 576, n. 84 New. Criminal Law, 16 C. J., sec. 1524, p. 741, n. 38.
[11]  Banks and Banking, 7 C. J., sec. 194, p. 576, n. 85 New. Criminal Law, 16 C. J., sec. 2506, p. 1063, n. 85.
[12].  Banks and Banking, 7 C. J., sec. 194, p. 576, n. 83.  Indictments and Informations, 31 C. J., sec. 451, p. 840, n. 76.

9.  See 8 R. C. L. 181.

*Appeal from District Court, Valley County; C. D. Borton, Judge.*

E. P. ASAL was convicted of making a false bank report to the superintendent of banks, and appeals from the judgment and from the order denying his motion for a new trial. Judgment reversed and cause remanded for a new trial.

*Messrs. Tressler & Kirton* and *Messrs. Hurd, Rhoades & Hallett,* for Appellant, submitted a brief; *Mr. George E. Hurd* argued the cause orally.

The statute under which defendant was prosecuted is unconstitutional as delegating to the superintendent of banks legislative power in requiring reports of the condition of state banks. The legislature could not authorize the superintendent of banks to require in any form of report anything other than a detailed statement, under appropriate schedules, of the resources and liabilities of the State Bank of Nashua. Plenary power to require what he might arbitrarily, or otherwise, elect was not and could not be delegated to him. (*St. Charles State Bank* v. *Wingfield,* 36 S. D. 493, 155 N. W. 776; *State* v. *Holland,* 37 Mont. 393, 96 Pac. 719; 12 C. J. 839, and notes; *O'Neil* v. *American Fire Ins. Co.,* 166 Pa. 72, 30 Atl. 943; *Chicago, M. & St. P. R. R. Co.* v. *Railway Commrs.,* 76 Mont. 305, 45 Am. St. Rep. 650, 26 L. R. A. 715, 247 Pac. 162; Cooley on Constitutional Limitations, 6th ed., p. 137; *King* v. *Concordia Fire Ins. Co.,* 140 Mich. 258, 6 Ann. Cas. 87, 103 N. W. 616; *Davenport* v. *Elrod,* 20 S. D. 567, 107 N. W. 833; *Locke's Appeal,* 72 Pa. 491, 13 Am. Rep. 716; *Anderson* v. *Manchester Fire Ins. Co.,* 59 Minn. 182, 50 Am. St. Rep. 400, 28 L. R. A. 609, 60 N. W. 1095, 63 N. W. 241; *Dowling* v. *Lancashire Ins. Co.,* 92 Wis. 63, 31 L. R. A. 112, 65 N. W. 738; *Cincinnati W. & Z. Ry. Co.* v. *Clinton Co.,* 1 Ohio St. 77; *Field* v. *Clark,* 143 U. S. 649, 36 L. Ed. 294, 12 Sup. Ct. Rep. 495.)

Applying the plain elementary principles announced in the above cases to the case at bar, we are compelled to conclude that the legislature could not delegate to the superintendent of banks unlimited authority to insert in a form prescribed by him any item beyond those mentioned in section 6071 as amended. When he passes beyond such limitation, as he did here, his act was nugatory and an incorrect item in such schedule could not form an element of the crime of making a false report to him.

Evidence tending to show the established custom in vogue in the locality of the State Bank of Nashua, and throughout Montana, and followed and sanctioned by the superintendent of banks, in the matter of a bank taking credit for remittances and items for which credit had been arranged on the date of the remittance or date of forwarding securities for credit, was erroneously excluded by the court. Following such practice, one making such report could not possibly deceive the superintendent of banks and if he could not be deceived by it there could not be any intent to deceive, nor could there be any knowledge that the report was false.

Appellant herein was charged with a crime involving a specific intent, to-wit: the intent to deceive the superintendent of banks, or persons authorized to examine the bank. It is axiomatic that one so charged may testify fully as to his motives, intent or belief. (1 Wigmore on Evidence, p. 716; *State* v. *Calongue,* 111 Kan. 332, 206 Pac. 1112; *State* v. *Givens,* 28 Idaho, 253, 152 Pac. 1054; *Delano* v. *Goodwin,* 48 N. H. 203, 97 Am. Dec. 601; *State* v. *Johnson,* 17 N. D. 554, 118 N. W. 230; *Cummings* v. *State,* 50 Neb. 274, 69 N. W. 756; *People* v. *Martel,* 21 Cal. 573, 132 Pac. 600.)

No law prohibits the superintendent of banks, or the banks over which he has supervision, from following the practice, which was followed by appellant in signing and verifying the report in which credit for the item in controversy was taken. Where the law does not prohibit, a custom or usage may arise and be followed. (17 C. J. 471.) The established

custom or usage of a bank is binding on persons dealing with it. (*Mills* v. *Bank of United States,* 11 Wheat. 431, 6 L. Ed. 512; *San Francisco Nat. Bank* v. *American Nat. Bank,* 5 Cal. App. 408, 90 Pac. 558; *Farmers Bank etc. Co.* v. *Newland,* 97 Ky. 464, 31 S. W. 38; *Chicopee Bank* v. *Eager,* 9 Met. (Mass.) 583.)

Four re-enactments of the law in question have been considered by the legislatures of this state. During all of this period of twenty-two years these legislatures knew that the interpretation placed upon it by the superintendent of banks was that which exists throughout Montana to-day. This amounts to an implied recognition and approval of the construction of the statute placed upon it by a branch of the executive department of this state. The legislature is presumed to have knowledge of such an established usage by a branch of the executive department of the government. (*National Lead Co.* v. *United States,* 252 U. S. 140, 64 L. Ed. 496, 40 Sup. Ct. Rep. 237 [see, also, Rose's U. S. Notes Supp.]; *United States* v. *Bailey,* 9 Pet. 238, 9 L. Ed. 113 [see, also, Rose's U. S. Notes]; *United States* v. *G. Falk & Brother,* 204 U. S. 143, 51 L. Ed. 411, 27 Sup. Ct. Rep. 191; *Edward* v. *Darby,* 12 Wheat. 206, 6 L. Ed. 603.)

This evidence, if admitted, would have reflected light upon the condition of appellant's mind at the time he signed and verified the report. It would disprove the specific intent to deceive the superintendent of banks, with which he was charged. Clearly, error was committed in excluding it.

Ordinarily speaking, entries which correctly record and reflect in the accounts and reports of a bank actual transactions, even though unauthorized, are not false entries, and a report involving such entries is not a false, but a true report. (*Twining* v. *United States,* 141 Fed. 41, 72 C. C. A. 529; *Coffin* v. *United States,* 156 U. S. 432, 39 L. Ed. 481, 15 Sup. Ct. Rep. 394 [see, also, Rose's U. S. Notes]; *Dow* v. *United States,* 82 Fed. 904, 27 C. C. A. 140; *United States* v. *Young,* 128 Fed. 111; *United States* v. *McCarty,* 191 Fed. 523.) The report

involved herein disclosed nothing which the books did not disclose. It was merely a *résumé* of details of daily transactions gleaned from the books in the usual business routine.

The specific intent to deceive was a vital element of the State's case, necessary to be proved by evidence, beyond a reasonable doubt.

We are not dealing here with that class of crimes in the proof of which general criminal intent is all that is necessary to be shown in addition to the criminal act. But here the quantum of proof which the state must present is that which establishes, beyond a reasonable doubt, such specific intent. It has not done so. (*State* v. *Hanson*, 49 Mont. 361, 369, 141 Pac. 669; *State* v. *Hennessy*, 73 Mont. 20, 234 Pac. 1094; 16 C. J., pp. 80, 81, secs. 47, 48, and cases cited in notes, 45, 61.) The last citation expressly lays down the rule that where a specific intent must be shown the state must go beyond proof of the unlawful act charged from which a general criminal intent may be inferred, and must affirmatively prove the specific intent alleged.

We submit that the facts and circumstances surrounding appellant's signing and verifying such report negative such intent and the state has failed in its proof upon this issue.

It was error for the court to excuse a juror unless the examination of such juror showed he was incompetent to serve. (*State* v. *Williams*, 31 S. C. 238, 9 S. E. 853.)

The trial court's dismissal, of its own motion, of a juror in a murder prosecution, without apparent cause, held error where juror's answers were fair and to the point and showed him to be qualified to serve. (*Ex parte Crow*, 89 Tex. Cr. 149, 230 S. W. 148; *McGowan* v. *State*, 89 Tex. 447, 231 S. W. 763; *Bell* v. *State*, 115 Ala. 25, 22 South. 526.) And it has likewise been held in the following civil cases that the peremptory challenging of a juror by the court is reversible error: *Hildreth* v. *City of Troy*, 101 N. Y. 234, 54 Am. Rep. 686, 4 N. E. 559; *Welch* v. *Tribune Pub. Co.*, 83 Mich. 661, 21 Am. St. Rep.

629, 11 L. R. A. 233, 47 N. W. 562; see, also, *State* v. *Diedtman,* 58 Mont. 13, 190 Pac. 117.

*Mr. L. A. Foot,* Attorney General, and *Mr. A. H. Angstman,* Assistant Attorney General, for the state, submitted a brief; *Mr. Angstman* argued the cause orally.

The statutes in question do not delegate legislative power to the superintendent of banks. (*State* v. *Struble,* 19 S. D. 646, 104 N. W. 465; *State* v. *Jackson,* 20 S. D. 305, 105 N. W. 742.) We admit that the legislature cannot delegate legislative powers, but we contend that the matter of prescribing the form of the report to be submitted is not legislative power. (*In re Kollock,* 165 U. S. 526, 41 L. Ed. 813, 17 Sup. Ct. Rep. 444; *Kansas City Southern Ry. Co.* v. *United States,* 231 U. S. 423, 52 L. R. A. (n. s.) 1, 58 L. Ed. 296, 34 Sup. Ct. Rep. 125 [see, also, Rose's U. S. Notes]; *Blue* v. *Smith,* 69 W. Va. 761, 72 S. E. 1038; *Bailey & Bean* v. *Wilson,* 128 Miss. 49, 90 South. 362; *Steele* v. *Louisville etc. R. R. Co.* (Tenn.), 285 S. W. 582; *Lee* v. *Marsh,* 230 Pa. 351, 79 Atl. 564.)

Evidence of the banking custom was properly excluded. The principal objection made to this line of testimony was that there was no foundation laid for its introduction.

Many cases are cited by appellant in support of his contention that a custom among banks is binding upon those who deal with it. The cases cited are civil cases, and, of course, are not any authority on the proposition that an unlawful act becomes lawful when habitually persisted in with the knowledge of those administering the law. Rather the correct rule is set forth in *People* v. *Helmer,* 13 App. Div. 426, 43 N. Y. Supp. 642, as follows: ''The fact that the officers of this bank had been accustomed for several years to make and exhibit false entries in their books was no defense for making and exhibiting the particular false entry charged in the indictment. The fact that a person has committed a series of offenses is not an excuse for committing the last of a series for which he is indicted.''

The intent of a person to commit a crime can only be determined by the circumstances connected with the offense. (Sec. 10727, Rev. Codes 1921; *Hewett* v. *State* (Okl.), 252 Pac. 1109–1111.) It is a mental attitude that exists in the defendant at the time the act is completed or is committed, and it naturally follows that a defendant standing trial upon such a charge will always deny that he had such an intent. It is to be noted that the defendant is not claiming that a mistake or accident happened. His defense is that he thought the report was correct when he signed it. The evidence shows, however, that subsequent to the signing and before it passed from his control on its way to the superintendent of banks he knew the report to be false. The only rational conclusion to be drawn from his failure to correct the report is that he intended to deceive. What other rational conclusion could the jury draw?

Irregularities in the selection of a jury do not affect the verdict unless it appears that the defendant has in some way been prejudiced. The general rule is stated in 35 C. J. 302, as follows: "A plain disregard of the statutory provisions with regard to the formation of the trial jury or a departure therefrom by which a party is deprived of a substantial right is ground for reversal, but mere irregularities are not, in the absence of any showing of prejudice resulting therefrom." (See *State* v. *Rocker*, 138 Iowa, 653, 116 N. W. 797; *State* v. *Kennedy*, 11 La. Ann. 479; 35 C. J. 302.)

Counsel contend that certain exhibits were not admissible because either used as book entries, or as copies of book entries, they were hearsay and no proper foundation has been laid. Ever since the decision in the case of *Ramsey* v. *Cortland Cattle Co.*, 6 Mont. 498, 13 Pac. 247, the rule in this state has been that secondary evidence is admissible to prove that the books of a certain company do not show a certain credit. This is likewise the rule established by the authorities generally. (See *Miner* v. *State*, 27 Ariz. 248, 232 Pac. 875; *Waldron* v. *Priest*, 96 Me. 36, 51 Atl. 235; *Perry* v. *Camilla Cotton*

*Oil & Fertilizer Co.,* 28 Ga. App. 512, 111 S. E. 823; *Sanders*
v. *Mayo,* 186 N. C. 108, 118 S. E. 910; *Sunshine Oil Co.* v.
*Dooley* (Tex. Civ. App.), 238 S. W. 357; *Burton* v. *Driggs,* 20
Wall. 125, 22 L. Ed. 299; 22 C. J. 990, notes 47 and 48.)

The evidence in this case shows that this exhibit was received
by the Nashua bank and filed as a part of its records. It
was admitted by the Nashua bank and its officers to be correct
in so far as it did not contain the item of credit in the sum
of $3,000. It was dealt with as being correct. When the
correctness of a writing is admitted it is admissible.

The rule is stated in 22 C. J. 1023, as follows: "An admis-
sion by the party against whom a copy of a writing is sought
to be used, that the copy is correct, is usually held to render
the copy admissible in evidence."

MR. JUSTICE MYERS delivered the opinion of the court.

With others, defendant was indicted jointly for the alleged
offense of making to the state superintendent of banks a false
report of the condition of a state bank.

With others, defendant was engaged, at Nashua, in Valley
county, in conducting the State Bank of Nashua, a banking
corporation, incorporated under the laws of Montana. De-
fendant was a director and the cashier of the bank. January
3, 1924, the superintendent of banks issued and mailed to de-
fendant a call for a report, to show the condition of the State
Bank of Nashua, at the close of business, December 31, 1923,
and to be made on a blank form furnished by the superin-
tendent. The call and the form were received by defendant.
In response, a report of the condition of the bank, at the close
of business on December 31, 1923, was made and sent to the
superintendent.

The report was subscribed and sworn to by defendant, as
cashier, and was signed, in attestation, by J. E. Arnot and
A. M. Sheldon, as directors. The report contained the state-
ment that at the close of business, December 31, 1923, there
was due from the First National Bank of Minneapolis, a bank-

ing corporation at Minneapolis, Minnesota, and an approved reserve agent, to the State Bank of Nashua the sum of $4,196.03 and listed such alleged indebtedness as a part of the resources of the reporting bank. Later, a grand jury found the indictment upon which the prosecution of this case was based. The indictment, in addition to alleging the foundational facts, as well as the issuance of the call and the making of the report and the statement in the report of the alleged indebtedness, in the sum of $4,196.03, of the First National Bank of Minneapolis to the State Bank of Nashua, alleged that such statement was false and that at the close of business, December 31, 1923, there was not due from the First National Bank of Minneapolis to the State Bank of Nashua the sum of $4,196.03 or any other sum, but that, at that time, the account of the State Bank of Nashua with the First National Bank of Minneapolis was overdrawn in the sum of $971.79 and that such false statement in the report of the State Bank of Nashua was made wilfully, wrongfully, unlawfully, knowingly and feloniously, with intent to deceive the superintendent of banks and his duly authorized agents and any and all other persons duly authorized to examine the reporting bank.

The defendant had a separate trial. He was found guilty and judgment was pronounced. He moved for a new trial. The motion was denied. Defendant appealed from the judgment and from the order denying his motion for a new trial and he assigns a large number of specifications of error.

The indictment is based upon section 6077, Revised Codes of [1] 1921. That section is divided into and composed of three inhibitions and the second thereof is subdivided into two parts. As so divided, it provides as follows:

(1) "Every officer or other person authorized by this act who wilfully and knowingly makes any false statement of facts, statement of account or report;

"(2) And every officer, agent or clerk of any bank who (1) wilfully and knowingly makes any false entries in the books of such bank or (2) knowingly subscribes or exhibits false

papers, with intent to deceive any person authorized to examine such bank;

"(3) And every person authorized by the provisions of this act to make statements or reports, who wilfully and knowingly subscribes or makes any false statement or report, shall be deemed guilty of a felony."

At the outset, let us say counsel for the state now contend that the prosecution of the case was based upon the third division of that section and that the state did not and does not have to prove defendant guilty of making a false report "with the intent to deceive any person authorized to examine such bank." We do not agree with that contention.

It is manifest and we hold that the indictment is based upon, and the case was tried below under, the second subdivision of division numbered 2 of the section, viz.: "Every officer, agent or clerk of any bank who * * * knowingly subscribes or exhibits false papers, with the intent to deceive any person authorized to examine such bank * * * shall be deemed guilty of a felony."

The defendant was an officer of the bank, the cashier, and, in making the report, he acted as such officer. The bank was a state bank. The superintendent of banks and his examiners are authorized to examine state banks. (Sec. 6083, Rev. Codes 1921.) The indictment charges that defendant and others [2] made a false report, "with the intent in the said defendants to deceive the superintendent of banks and his duly authorized agents and any and all other persons duly authorized to examine said bank." At the trial, evidence was offered by the state and admitted, over objection, for the avowed purpose of showing in defendant an intent to deceive the superintendent of banks. We find in the brief of counsel for the state argument that certain evidence offered and admitted over the objection of defendant was competent because it was offered for the purpose of showing and tended to show in defendant such an intent. The trial court instructed the jury that specific intent to deceive the superintendent of banks was an

essential ingredient of the offense charged and that it must be proven beyond reasonable doubt or the defendant should be acquitted. The case was tried below on the theory that intent to deceive the superintendent of banks was a part of the crime charged and had to be proven; evidently it was tried under the provisions of the second subdivision of division numbered 2 of section 6077, supra, and counsel may not now be allowed to change the theory of the case. Counsel for the state may not be allowed to take inconsistent attitudes—argue in one portion of their brief that evidence was competent because it showed an intent to deceive and, in another portion, argue that such an intent was not necessary to be proven. We hold, as did the trial court, that the intent to deceive, as charged, is an essential ingredient of the crime charged and, as such, had to be proven beyond reasonable doubt, in order to justify conviction.

Counsel for defendant contend the indictment is fatally defective and by specification of error challenge its sufficiency. [3] One of the objections urged is that the indictment does not show that the past day specified by the call of the superintendent of banks as the day as of which and at the close of which the condition of the bank was to be reported, viz., December 31, 1923, was a day designated by the comptroller of currency of the United States for reports of national banking associations.

The statutes of Montana provide for regular and special reports of state banks. Section 6074, Revised Codes of 1921, as amended, Chapter 84, Session Laws of 1923, calls for at least three reports, each year, to the superintendent of banks. They are called regular call reports. (Sec. 6071, Rev. Codes, 1921, as amended, Chap. 84, Sess. Laws 1923.) Other reports, designated by statute as special reports, are provided for. (Sec. 6073, Rev. Codes 1921.) According to section 6074, Revised Codes of 1921, as so amended, regular call reports shall be made upon the call of the superintendent of banks and "the 'past day specified' by the superintendent of banks"

as the day as of which and at the close of which the condition of a bank shall be reported shall be "the day designated by the comptroller of currency of the United States for reports of national banking associations." The indictment alleges that the superintendent of banks called for "a regular call report." It is a presumption of law "that official duty has been regularly performed." (Sec. 10606, Rev. Codes 1921.) The law presumes that the superintendent of banks made his call in conformity with law. We hold it was not necessary for the indictment to allege that December 31, 1923, had been designated by the comptroller of currency of the United States as a day for reports of national banking associations.

Another objection made to the indictment is that the statute providing for and requiring reports of the condition of state [4] banks to be made to the superintendent of banks, upon his call, is unconstitutional, in that it delegates to the superintendent legislative power. A careful reading of the several sections of the statute and of the authorities cited convinces us that the objection is unfounded. Other objections to the indictment we deem equally without merit. Upon the authority of *In re Lockhart,* 72 Mont. 136, 232 Pac. 183, and other authorities examined, we hold the indictment impervious to attack.

Counsel for defendant earnestly contend that the evidence is insufficient to support the verdict or judgment; that there is no evidence of guilt; and that not only should the judgment be reversed but that we should order the case dismissed. We cannot see our way clear to agree with those contentions.

It is plain that, in respect to the item alleged by the indictment to be false, the report was incorrect. The report contained the statement that at the close of business, December 31, 1923, there was due from the First National Bank of Minneapolis to the State Bank of Nashua the sum of $4,196.03. That statement was not true. Giving the Nashua bank credit for remittances made directly to the Minneapolis bank, December 31, 1923, and theretofore, which, on December 31, 1923, had not reached the latter bank and had not been credited to

the former, and charging the former with drafts drawn against its account in the Minneapolis bank and which were in transit or in circulation, we think the Nashua bank, in the eyes of the law, on December 31, 1923, at the close of business, had, in the Minneapolis bank, a credit of $1,196.03 and no more. Counsel for the state contend there was an overdraft and the indictment charges an overdraft of $971.79 but we consider the law would say, a credit of $1,196.03. Defendant subscribed and swore to the report, containing the statement that there was a credit of $4,196.03. Therefore, he subscribed and swore to an untrue report; but falsity is not all that is required. [5] Subscribing the report was a part of making it. The trial court instructed the jury that, to justify conviction, it had to be proven, beyond reasonable doubt, not only that the report was false in the particular specified but that defendant knew it to be false, when he made it, and that he made it wilfully and knowingly, with intent to deceive the superintendent of banks. In that the court was correct. (*State* v. *Dahlgren,* 74 Mont. 217, 239 Pac. 775.)

Counsel for defendant contend that, even though there was a discrepancy of $3,000 between the amount reported to be due from the Minneapolis bank and the amount actually due, it was immaterial, inasmuch as it did not affect the sum total due from banks, there being, in that event, simply $3,000 less due from the Minneapolis Bank and $3,000 more due from Sheldon Brothers Company, hereafter referred to, than reported. We do not agree. The Minneapolis bank was an approved reserve agent. There is no evidence that Sheldon Brothers Company was, nor, in this case, even that it was a bank. We think the superintendent of banks had a right to know where the Nashua bank's cash reserve was kept. The statute requires a report in detail, under appropriate schedules. It has been held that overdrafts may not be reported as loans, although the mistake of classification does not alter the sum total of resources. (*United States* v. *Graves,* 53 Fed. 634.) Counsel for defendant contend that, as the sum total due from

banks was not altered, claiming Sheldon Brothers Company was a bank, no harm was done. That is an argument that may be applied to the question of intent to deceive.

The question of defendant's good faith was a question for the jury. There is not much substantial or material conflict in the evidence but, in some respects, the evidence is such that different inferences therefrom might be drawn by different minds.

Certain facts are established beyond dispute. A. M. Sheldon was a director of and the vice-president of the State Bank of Nashua. He lived in Minneapolis. There he conducted a business institution known as Sheldon Brothers Company, designated as bankers and investors. It was incorporated. It did much business with and for the State Bank of Nashua. It had business quarters in the same building as did the First National Bank of Minneapolis, with which it did business. December 22, 1923, the State Bank of Nashua issued two certificates of deposit in the sum of $5,000 each, both payable to the order of Sheldon Brothers Company. December 24, 1923, defendant, as cashier, mailed them to Sheldon Brothers Company, with a letter directing that company to place the amount thereof, $10,000, to the credit of the State Bank of Nashua, with the First National Bank of Minneapolis. Testimony shows that the letter and the certificates should have reached their destination several days before December 31 and they did. At the time of the mailing of that letter and the certificates, there was entered on the books of the Nashua bank a charge of $10,000 against the Minneapolis bank. The testimony shows that it long had been the custom of the Nashua bank to transact such business in that manner with those parties; that it was and long had been a frequent occurrence for the Nashua bank to issue certificates or other evidence of indebtedness and to send such or send securities or collateral to Sheldon Brothers Company and to request it to place them with the First National Bank of Minneapolis and have the Nashua bank given credit therefor.

The Minneapolis bank was the twin-cities correspondent of the Nashua bank. The latter kept there a continuous, active, fluctuating account; made remittances, to be put to its credit; drew drafts on its account. In the matter of obtaining credit by certificates or other evidence of indebtedness, securities or collateral, Sheldon Brothers Company acted as the agent or go-between for the Nashua bank. Testimony shows that it was and long had been the custom of the Nashua bank, either when making remittances direct to the Minneapolis bank or when sending to Sheldon Brothers Company papers to be used as a basis for additional credit at the Minneapolis bank, to make a charge therefor, on the books of the Nashua bank, against the Minneapolis bank, upon the day the remittance was made to the Minneapolis bank or the papers forwarded to Sheldon Brothers Company.

December 27, 1923, Sheldon Brothers Company wrote the State Bank of Nashua a letter, acknowledging receipt of defendant's letter of December 24 and the two certificates of deposit for $10,000 and saying "we are crediting the amount to your account." Defendant received the letter, in due course, and he testified that he understood and supposed from it that Sheldon Brothers Company had indorsed the certificates and turned them over to the Minneapolis bank, as requested, and that the crediting mentioned in the letter was with the Minneapolis bank, as intended; that that is what he supposed was meant. That is the way the matter stood until near the time of making the report called for.

Testimony shows the call for the report was received at the Nashua bank, January 4. The report, testimony shows, was prepared by Mr. Wick, the assistant cashier, that day, and, the same day, was subscribed and sworn to by defendant. Defendant and Wick testified that until near to that time they supposed the whole of the $10,000 represented by the certificates of deposit had been put to the Nashua bank's credit, in the Minneapolis bank; but that a short time before January 4 they learned or, at least, understood (just how was not explained)

79 Mont.—26

that Sheldon Brothers Company had deposited in the Minneapolis bank, to the credit of the Nashua bank, only $3,000 of the proceeds of the certificates of deposit and had retained the remaining $7,000 thereof. Thereafter, the testimony shows, in order to make correct the books of the Nashua bank and make them show the correct condition of affairs, as understood, the bookkeeper of the Nashua bank changed the entry theretofore made, when the Minneapolis bank was charged with $10,000, and made corrected entries, as of the original date, December 24, 1923, charging the Minneapolis bank with $3,000 and Sheldon Brothers Company with $7,000. That charge of $3,000 against the Minneapolis bank, as of December 24, 1923, in accordance with what defendant and others in the Nashua bank understood to be the facts and in addition to a balance of $1,196.03 which its books showed it already had in the Minneapolis bank, gave the Nashua bank, on its books, a credit of $4,196.03 in the Minneapolis bank, as of December 31, 1923. Thus, the testimony shows, matters stood when the report was subscribed and sworn to, January 4, 1924, by defendant. The report showed a credit of $4,196.03 with the Minneapolis bank and a credit of $7,000 with Sheldon Brothers Company. It was a correct report, according to the books of the Nashua bank.

The report had to be attested by the signatures of two directors, J. E. Arnot, of Glasgow, Montana, and A. M. Sheldon, of Minneapolis. Defendant testified that, on January 4, he mailed the report (subscribed and sworn to by him) to Arnot, at Glasgow, and, by letter to Arnot, requested him to sign it and then to transmit it, by mail, to Sheldon, at Minneapolis, with directions (prepared by defendant and sent to Arnot) to him to sign it and that he, Sheldon, then mail it back to the Nashua bank. That was the original report.

It appears from the evidence that a tentative or preliminary report of the same nature and to the same effect was mailed at Nashua, January 16, to the superintendent of banks, accompanied by a letter, written by the assistant cashier, saying it

was sent' because the original report had not been completed
and that it would be followed soon by the original. We take
it the original was not complete because it had not been signed
by the attesting directors and received back from them. The
rules of the superintendent of banks provide that a tentative
report may be sent in, if the original report may not be com-
pleted and sent in, within the required number of days, to be
followed by the original report, when completed. Apparently,
the tentative report was sent in because it was known or feared
the original report would not complete its round and reach the
superintendent in the required time. The original report, fully
signed, the evidence shows, was mailed at Nashua to the super-
intendent, January 23. The prosecution of this case is based
upon the original report.

Meantime, events had intervened. It appears that Sheldon
Brothers Company kept the two certificates for the aggregate
sum of $10,000 and deposited no part of the proceeds thereof
(neither $3,000 nor any other sum) with the Minneapolis bank.
However, January 3, 1924, A. M. Sheldon obtained from the
Nashua bank a credit of $2,953.90, with the Minneapolis bank,
by executing, in the name of the State Bank of Nashua, by
himself, as vice-president, and delivering to the Minneapolis
bank the promissory note of the State Bank of Nashua to the
First National Bank of Minneapolis, for the sum of $3,000,
due three months after date, without interest. The Minneapolis
bank accepted the note, discounted it and gave the Nashua
bank credit for the sum of $2,953.90. Thus, it is seen the
Nashua bank was not given credit by the Minneapolis bank
for $3,000, less discount (actually $2,953.90), until January
3, and then not from any proceeds of the certificates of deposit
but on account of the note so executed and delivered by A. M.
Sheldon. A sum of $3,000 was relied upon by defendant,
in making the report, to make up a credit of $4,196.03 with
the Minneapolis bank, at the close of business, December 31,
1923. Manifestly, it was not there at that time.

The record shows that on the day of the execution of the note, January 3, 1924, Sheldon Brothers Company wrote and sent defendant a letter, informing him that; instead of depositing with the Minneapolis bank the certificates for $10,000, it had given the Nashua bank credit with Sheldon Brothers Company for the whole of the sum of $10,000 represented by the certificates and that A. M. Sheldon, as vice-president of the State Bank of Nashua, had that day executed and delivered to the Minneapolis bank the note of the Nashua bank for $3,000, due in three months, for which the Minneapolis bank had that day, January 3, given the Nashua bank credit (saying nothing about the discount). That letter was received by defendant, in due course. Testimony showed it required two days for mail to be conveyed between Minneapolis and Nashua; also, that the report had been subscribed and sworn to and started on its round, for attesting signatures, before that letter was received by defendant.

The indictment against defendant is denominated therein an indictment for making a false report but the provisions of the statute under which he was indicted and tried is an inhibition against knowingly subscribing or exhibiting false papers, with intent to deceive. Defendant admitted signing the report. We consider the mailing of it, by whomsoever done or by whose authority done, if any, exhibiting it. (3 Words and Phrases; Bouvier's Law Dictionary; Standard Dictionary.) Two compound questions of fact, in our view, under the evidence, as to which different inferences might be drawn, arose for decision by the jury. They are: (1) When defendant signed the report, did he know it to be false and thereby intend to deceive the superintendent; (2) If not, did he exhibit it (mail or allow it to be mailed) to the superintendent, knowing [6] it to be false, with intent to deceive that official? Even if defendant, when he signed the report, believed it to be true, if he learned thereafter that it was false and then sent or knowingly permitted it to be sent to the superintendent, with-

out change and with intent to deceive, he thereby became guilty.

Even though defendant's contention that, when he signed the report and started it on its round for attestation, he believed it to be true be conceded, the fact remains that when he received A. M. Sheldon's letter of January 3 he learned and thereafter knew the report was not true as to the item of $3,000 theretofore supposed and reported to be to the credit of his bank, in the Minneapolis bank, at the close of business, December 31, 1923. The report came back to the Nashua bank after receipt of that letter and thereafter was forwarded to the superintendent. Undoubtedly an untrue report went to the superintendent. The evidence shows it was sent by the assistant cashier, accompanied by a letter, dated January 23, from him (without his autograph signature), saying the report is transmitted and asking for the return of the tentative report. Did defendant allow it to be sent, with his knowledge and approval? If so, did he thereby intend to deceive the superintendent? Those are questions that were wholly for the jury.

Defendant testified he never again saw the report after it was started, January 4, on its round for attesting signatures and thereafter did not have anything to do with it. There is no direct contradiction of that testimony. Counsel for the state claim circumstances and presumption contradict it. They contend that, when the original report, duly attested, came back to the Nashua bank, before January 23, 1924, as it must have, defendant must have known of its return and that it was his duty, before it went to the superintendent, to correct it in accordance with the facts that had come to his knowledge, after the report was subscribed and sworn to by him, so as to reduce by $3,000 the credit claimed in the Minneapolis bank and show $3,000 more on credit with Sheldon Brothers Company. Whether or not he knew of the return and forwarding of the report, he did not correct it. If he knew, the question then involved was one of intent. Of course, for de-

fendant to have made the change would have required sending the report around again, after the change, to Arnot and Sheldon, for their assent to the change, or would have required obtaining, in some way, their ratification. He had no right to change it without their assent or ratification.

The whole matter was properly submitted to the jury and the jury found against the defendant. We may not disturb the verdict unless reversible error of law occurred during the trial. We turn now to the record, to see if there may be found any prejudicial error, assigned as error.

Counsel for defendant contend first that the trial court erred [7] in its rulings regarding the selection and impaneling of the jury. We do not think there is merit in the contention. The court inadvertently made a mistake but corrected it at first opportunity and in ample time. After it had been corrected and counsel for defendant had objected and excepted, defendant had left, unexercised, one peremptory challenge; and, after the court had had another venireman called into the jury-box, defendant failed to exercise his remaining peremptory challenge. Having failed to exercise it, he may not complain. We do not consider defendant was prejudiced.

Counsel for defendant assign as error the rulings of the [8] court in sustaining objections to testimony sought to be elicited by defendant and offers of proof made by defendant to show an established custom in vogue among Montana banks, known to and sanctioned by the superintendent of banks, of charging on their books (the day remittances are made or credit arrangements are made) to correspondent banks the amounts of remittances or the sums for which credit is procured. Several questions intended to elicit such testimony were asked by counsel for defendant and, upon objection, were held incompetent. Furthermore, counsel for defendant offered to prove by a number of qualified witnesses the existence for many years of such a custom and, each time, there being objection, the objection was sustained.

The principal contention of counsel for the state in arguing against the competency of the testimony so offered and sought to be elicited is that no foundation for it was laid. Counsel for the state contend that the offers of proof referred solely to remittances and that the evidence shows the credit the Nashua bank claimed did not arise from a remittance to the Minneapolis bank; hence, it is claimed, the lack of foundation. In that, counsel are not wholly correct. There is some confusion in the record, in that respect.

True, witness Kleve, a deputy bank examiner, witness for the state, whose testimony state's counsel cite in argument, testified: "My idea is those C. Ds. do not come under the class of remittances." He qualified that by saying: "If you made up one to-night and sent it to some bank where you were doing business, it would be a remittance." Impliedly, he drew a distinction between a certificate of deposit going directly from one bank to another and going through an intermediary or go-between, as Sheldon Brothers Company, in this instance, holding the one to be a remittance and the other not; yet, on cross-examination, he said: "Well, no; that isn't very much of a distinction." He said his department had no criticism of the certificates for $10,000. Then he referred to the certificates as remittances and said: "They didn't get the credits for these remittances in time to show it on that statement but they are entitled to show that, because it was in the course of being allowed." He said further: "It would have been perfectly agreeable if arrangements had been made to get credit." He did not give entire assent to the theory that it was proper to charge the Minneapolis bank with the certificates, the day they went to Sheldon Brothers Company, for deposit in the Minneapolis bank, but seemed to hinge the matter on whether or not arrangements had been made to get credit for them.

Other witnesses referred to the disposition of the certificates of deposit as a remittance. The certificates were frequently referred to, in testimony, as remittances to the

Minneapolis bank; the idea seeming to be, remittances through an intermediary. The books of the Nashua bank, in a number of places, had the amount of the certificates or some portion thereof charged as a remittance. State's counsel claim the sending of the certificates was a transfer but the distinction between remittance and transfer we think entirely too technical to serve as an objection to the proffered evidence.

Besides, the offers of evidence were not confined to offers to prove custom with regard to remittances, in a restricted sense. Offer was made to prove by witness Kleve that "the forwarding of C. Ds. such as exhibits Nos. 20 and 29 in this case, with which he is familiar, to Sheldon Brothers Company by the State Bank of Nashua, for credit in the First National Bank of Minneapolis, and taking credit for such an amount on the day when such items went forward" constituted an item in due course of business of the State Bank of Nashua. State's counsel object that the witness was not acquainted with the due course of business of the Nashua bank. We do not think that is the proper construction. We think the language means an item, in the due course of banking business, transacted by the Nashua bank.

Other offers of proof related to the custom in remitting money or "evidence of money"; the custom as to "arrangements for obtaining credit"; the custom in regard to "remittances or credits"; the attitude of the superintendent of banks in regard to certain customs; the custom when loans had been arranged for; the due course of banking business. We think untenable the objection that no foundation had been laid for these offers of proof. Furthermore, Mr. Kleve, in his testimony, did testify that it was customary for banks to charge to correspondents, on the day of mailing, the amounts of remittances made to correspondents. Such line of testimony was entered upon and the offers to enlarge upon it, we think, should have been allowed.

In this connection, counsel for the state argue there is nothing in the evidence to show any arrangement between

the Nashua bank and the Minneapolis bank upon which defendant had a right to rely. A similar question was largely determinative in *State* v. *Dahlgren,* supra. Whether or not such an arrangement had been made in the case at bar is a close question and was one for the jury. With relation to the certificates and his act in sending them to Sheldon Brothers Company, to be placed in the Minneapolis bank, defendant testified: "It was the regular course of business with us; they were sent according to an agreement the State Bank of Nashua had with Sheldon Brothers; had been in effect quite a few years; there had been a considerable number of other items preceding this." He said further: "The First National Bank of Minneapolis was our principal correspondent; by correspondent, I mean it was the bank we did business with; it was the custom or practice to remit money and other matters of credit to the First National Bank of Minneapolis, frequently, practically daily and many times more than one, and these items sent out were charged to their account; that had always been customary." Mr. Wick, the late assistant cashier of the Nashua bank testified: "There was a sort of understanding with Sheldon Brothers Company to send in C. Ds. to them and they would in turn arrange for credit for us with the First National Bank of Minneapolis." He said further: "There was an account in the State Bank of Nashua with the First National Bank of Minneapolis during all of the time I was employed in any capacity in that bank; the State Bank of Nashua, during all of the time I was there, had arrangements with Sheldon Brothers Company to take over transactions for the bank with the First National Bank of Minneapolis; whenever the State Bank of Nashua requested·Sheldon Brothers·Company to place credit in the First National Bank of Minneapolis for us they always did it; it was largely a matter of routine."

If it may be said the testimony is vague as to whether or not there was any arrangement or understanding with the Minneapolis bank and, if so, what it was, there was almost, if not quite, as much vagueness and uncertainty about any

arrangement between the defendant's bank and another bank in the case of *State* v. *Dahlgren,* supra, in which this court held the evidence insufficient to convict. In that case, witnesses "disclaimed any personal knowledge" as to whether there was cash available in another bank to meet cashier's checks when issued; witnesses said "by some arrangements made" money was obtained from another bank; witnesses "did not know the particular arrangements made for the advancement of cash." In the case at bar, it may be noted that, while it was testified that it was and long had been the custom for the Nashua bank to request Sheldon Brothers Company to place or arrange credit for it with the Minneapolis bank and that, when requested, "they always did it," there is no evidence that Sheldon Brothers Company, in one instance, ever had failed to do it or that, in one instance, the Nashua bank had been disappointed. That is a matter to be considered in determining whether or not defendant had a right to rely and did rely in good faith upon his directions being carried out in the instance at hand.

There is involved not only the question if there was any express or implied understanding with the Minneapolis bank but if defendant had reason to believe and did believe there was and relied on such belief. It should be remembered that when A. M. Sheldon, of Sheldon Brothers Company, transacted business, for the Nashua bank, with the Minneapolis bank it was substantially the same as the Nashua bank doing it. He was vice-president of that bank. For the Nashua bank to send to A. M. Sheldon or Sheldon Brothers Company matters to be taken up with the Minneapolis bank was somewhat different from entrusting the mission to an outsider, a party not connected with the Nashua bank. We cannot see much difference between the Nashua bank doing business directly with the Minneapolis bank and doing it through Sheldon Brothers Company.

We think the trial court erred in ruling out defendant's offers. We think they were competent as shedding light upon

[9] his intent and his good or bad faith at the beginning of the transaction involved. Intent is generally a necessary element in a felony; it is particularly made so in this instance. When intent is involved, a defendant in a criminal case may always testify to his intent. (*State* v. *Smith,* 57 Mont. 563, 190 Pac. 107; *State* v. *Calongue,* 111 Kan. 332, 206 Pac. 1112; *State* v. *Givens,* 28 Idaho, 253, 152 Pac. 1054; *People* v. *Martel,* 21 Cal. App. 573, 132 Pac. 600.) Of course, if the defendant may testify in his own behalf as to his intent or lack of intent, the same may be proven by any other relevant evidence. Any evidence tending to shed light on intent or lack of intent is competent. (*State* v. *Hanson,* 49 Mont. 361, 141 Pac. 669; *United States* v. *Graves,* supra; *State* v. *Givens,* supra; *People* v. *Martel,* supra.) The case last cited was a prosecution for making a false report of the condition of a bank. In its opinion, the court said: "In all cases where, as in this charge, a specific intent to deceive is an essential ingredient in the offense, the defendant should be allowed to prove any fact tending to show that he had no such intent or that he did not knowingly make a false statement." The proffered testimony, had it been admitted, certainly would have shed some light upon the intent of defendant at the beginning of this matter.

Counsel for the state cite *State* v. *Cassill,* 70 Mont. 433, 227 Pac. 49, as authority for the ruling of the trial court in rejecting defendant's offers. The two cases are not analogous; in that respect, they are totally dissimilar. In the *Cassill Case,* the defendant offered to prove that, some sixteen or seventeen months before the date upon which the report of his bank (upon which he was tried) was based, one Montgomery, an Iowa banker, had made a vague, indefinite offer to lend defendant's bank $10,000, at any time, for reserve purposes. If true, it was only a bare offer. It was not followed, ever, by any negotiations, correspondence or application for a loan in such sum. No effort was made to get a loan of that amount. No note, certificate, evidence of indebtedness, security, col-

lateral, was forwarded. Apparently, the matter of a loan of that amount was never referred to again between the parties. The Iowa bank was not a correspondent of the defendant's' bank. The latter kept no account with the former; they had no constant or even occasional interchange of dealings. Apparently, not one item of real business between the two banks had ever occurred. Yet, the defendant in the *Cassill Case* made his report include, as a part of the resources of his bank, a fictitious sum of $10,000, listed as due from the Iowa bank. He seemed to rely, in justification, upon the assumption that he could borrow it, any time he might desire, from the Iowa bank. Yet, after the alleged promise of a loan of $10,000 and before the call for a report of the condition of his bank, the defendant applied to the Iowa banker for a loan of a less sum, $6,500, and it was refused. The two cases are far apart.

Counsel for the state contend that the rulings of the court in rejecting the offers, even if error, were not prejudicial. We do not agree. Defendant was entitled to show, by any competent evidence, that, from the beginning, he was actuated by good faith. He was entitled to show that, from beginning to end, at any stage and all stages of the matter, he acted in good faith. It was highly essential to a fair trial for defendant that he be allowed to show, if he could, that he was acting in good faith when he subscribed and swore to the report. The language of the section of the statutes under which defendant was tried is a double, disjunctive inhibition against knowingly subscribing or exhibiting false papers, with intent to deceive. Defendant was charged with both so subscribing and exhibiting a false paper. If he did either, he was guilty. The offered proof, if it had been admitted, would have tended to prove that defendant did not knowingly subscribe or swear to a false paper (and he was entitled to prove that), whatever he may have done or may not have done, thereafter. If the jury decided defendant knowingly subscribed a false report, that settled it; he was found guilty, then and there. On the other hand, if shown to the satisfaction of the jury that defend-

ant was acting in good faith at the beginning, believing he had a right to do as he did; believed he had arranged for credit; that would not only absolve him from the first element of guilt but it seems natural it would weigh in his favor all the way through. We hold the court erred in overruling the offers of proof and that the error prejudiced defendant.

Counsel for defendant urge as error the admission in evidence, as exhibits, over objection, of a number of sheets of [10] paper purporting to be copies of or papers made up from pages of the ledger and other bank books and records of the First National Bank of Minneapolis; reconcilement statements, statements of account, balances and the like. We think the admission thereof, in each instance, was error. Not one of them was sufficiently authenticated or vouched for. They only purported on the faces thereof to be one thing or another. Nobody who knew testified what they were or that they were genuine or correct. They were simply found among the papers and effects of the Nashua bank, after it had closed, and shown to be in the same condition as when the bank closed. We know of no rule of evidence admitting such papers, under such circumstances. We do not think the proper foundation was laid. *State* v. *Yegen,* 74 Mont. 126, 238 Pac. 603, is authority for our views; likewise, *Silver* v. *Eakins,* 55 Mont. 210, 175 Pac. 876. That point arose in *State* v. *Cassill,* supra. There the original sheets (not copies) from the loose-leaf ledger of an Iowa bank were introduced in evidence, over objection, and, upon appeal, it was held proper; but Mr. Montgomery, the banker, was there in person as a witness, and he identified the ledger sheets and testified to their genuineness and correctness. There was no such thing here. There was no official or employee of the Minneapolis bank present as a witness. The documents were not self-proving. In *State* v. *O'Neil,* 24 Idaho, 582, 135 Pac. 60, it is held that, when voluminous and numerous original records and books have already been introduced and received in evidence and are before the jury, it is competent for expert accountants who have

examined them to make tabulated and condensed statements, on separate sheets, in summarized form, of essential and salient facts and figures gleaned from the originals and to testify to the correctness thereof and that such sheets may be received in evidence; but the expert accountants who made the tabulated statements were there, testifying orally to the authenticity and correctness thereof. The opinion in that case cites a number of supporting cases but in each one some witness who knew and was competent was there in person to vouch for the documents.

Counsel for the state say Mr. Wick, the assistant cashier, used some of the papers in such manner as to show he regarded them as authentic and correct and in others, which he considered incorrect, he made corrections. He said they were from the First National Bank of Minneapolis and he filed them as records of the Nashua bank but he knew only that they came in the mail. He did not make them. He did not know if they were genuine or correct. He did not say they were true copies. It must be remembered that defendant was on trial on a criminal charge and that he was not responsible for nor bound by the acts of another unless the acts were shown to have been done in his presence or with his knowledge and by his authority or with his approval or consent. No such showing was made. True, after the sheets had been admitted (improperly, we hold), defendant, on cross-examination, answered some questions in regard to them, as to whether or not correct, in comparison with the books of the Nashua bank; but that did not make them competent. Had they been ruled out, as we hold they should have, defendant could not have been cross-examined as to them. We hold the court erred in such rulings and that the error was prejudicial.

Quite a number of specifications of error are based on other rulings of the court in admitting or excluding evidence. Some we deem without merit; in others, if there be error in the rulings complained of we do not consider it prejudicial. We do not deem it necessary to discuss any of them.

Counsel for defendant assign as error the rulings of the court in refusing to give a number of proposed instructions offered by defendant. We will not say we find reversible error in any of such rulings. Some of the offered instructions we think not correct; others, not applicable; others still were substantially covered by instruction given. We think, in fairness [11] to defendant, defendant's offered instruction No. 4 should have been given and that the court erred in not giving it. It declared that if defendant made an honest mistake and believed the report to be true, though, in fact, false, he should be acquitted. The spirit of the proposed instruction is fairly covered, perhaps, by instructions given but no instruction given mentions specifically an honest mistake or belief that the report was true. We do not say the refusal to give this offered instruction, alone and of itself, constitutes reversible error (were there no other error in the record) but the offered instruction is correct (*In re Lockhart,* supra; *State* v. *Jackson,* 20 S. D. 305, 105 N. W. 742), and we think defendant was entitled to it. We think, too, the court should have given, as modified, defendant's offered instruction No. 15.

Some of defendant's several offered instructions as to the right of defendant to charge to its correspondent, on the day of mailing for transmission, remittances to the correspondent, or money or its equivalent or what is regarded as equivalent, might have been proper and it may be should have been given had evidence of banking custom in support of the propriety thereof (which was excluded) been admitted and had the offered instructions been somewhat more carefully drawn to conform to the evidence that was admitted and evidence which, according to this opinion, should have been admitted, in the event it were favorable to the custom sought to be proven. As it is, the most of evidence of such character was excluded (erroneously we hold) and there was little on which to base such offered instructions and they were not, we think, so guarded as to fit altogether such evidence as was admitted.

Subject to these observations, we think the instructions given, taken as a whole, substantially correct and think they fairly well covered the evidence admitted and the issues submitted to the jury; at least no objection was made to any of them and no error therein is called to our attention.

The indictment charges there was, December 31, 1923, an overdraft of $971.79 in the account of the Nashua bank, in [12] the Minneapolis bank, while the report claimed a credit of $4,196.03. In fact, as shown by the proof, there was no overdraft but a credit of $1,196.03, being $3,000 less than claimed by the report. Counsel for defendant contend that discrepancy between the allegation and the proof is a fatal variance; we do not, however, so consider it. Even though the difference between the amount of the credit claimed by the report and that existing ($3,000) is not so great as the difference charged in the indictment, still it rendered the report incorrect and an untrue report was made, nevertheless, and that is the gist of the offense charged and, if made knowingly, with intent to deceive, it was a crime. According to Underhill on Criminal Evidence, second edition, paragraph 31, the test of the materiality of a variance in proof is, "does the indictment so far fully and correctly inform the defendant of the criminal act with which he is charged that, taking into consideration the proof which is introduced against him, he is not misled in making his defense or placed in danger of being twice put in jeopardy for the same offense?" According to that test, the variance in question, in this case, was not material and we so hold.

For the errors committed, as we have held, in rulings of the trial court, herein pointed out, upon admission or exclusion of evidence, and because of the ruling of the court in denying defendant a new trial, the judgment is reversed and the cause, remanded for a new trial.

*Reversed and remanded.*

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES STARK, GALEN and MATTHEWS concur.